Joseph LOCURTO, Plaintiff,

v.

Rudolph GIULIANI, Mayor of the City
of New York, Howard Safir, Commis-
sioner of the New York City Police
Department, and The City of New
York, Defendants.

Robert Steiner, Plaintiff,

v.

Rudolph Giuliani, Mayor of the City of
New York, Thomas Von Essen, Com-
missioner of the New York City Fire
Department, and The City of New
York Defendants.

Jonathan Walters, Plaintiff,

v.

Rudolph Giuliani, Mayor of the City of
New York, Thomas Von Essen, Com-
missioner of the New York City Fire
Department, and The City of New
York Defendants.

Nos. 98 Civ. 6495(JES), 98 Civ.
6505(JES), 98 Civ.
6567(JES).

United States District Court,
S.D. New York.

June 24, 2003.

New York City Civil Liberties Union Foundation, Christopher Dunn, Arthur Eisenberg (Norman Seigel, of counsel), New York City, for Plaintiff Joseph Locurto.

Sullivan Papain Block McGrath & Cannavo P.C. (Michael N. Block, of counsel), New York City, for Plaintiff Jonathan Walters.

Law Office of Robert Didio (Robert Didio, of counsel), Kew Gardens, NY, for Plaintiff Steiner.

Michael A. Cardozo, Corporation Counsel of the City of New York (Jonathan Pines, Assistant Corporation Counsel, of counsel), New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiffs Joseph Locurto, Robert Steiner, and Jonathan Walters (collectively "plaintiffs") bring these actions pursuant to 42 U.S.C. § 1983, alleging that defendants Mayor Rudolph Giuliani, Commissioners Howard Safir and Thomas Von Essen, and the City of New York (collectively "defendants"), violated their free speech rights as guaranteed by the First Amendment to the United States Constitution. Specifically, plaintiffs claim they were terminated in retaliation for engaging in protected speech. Plaintiffs seek reinstatement and compensatory and punitive damages. The Court conducted a bench trial on liability from January 7 to January 9, 2003. Having heard and observed all the witnesses, considered all the evidence presented, as well as the arguments made by the parties' counsel at trial and in their post-trial memoranda, the Court, for the reasons set forth below, finds in favor of plaintiffs. The following shall constitute the Court's findings of fact and conclusions of law as required by Fed. R. Civ. Proc. 52(a).

## BACKGROUND

For a number of years prior to 1998, a loose-knit group of the Broad Channel, Queens community had entered a float in the town's annual Labor Day parade (the "parade"). *See* Defs.' Ex. K, Transcript of Disciplinary Hearing of Steiner and Walters, Office of Administrative Trials and Hearings, Oct. 6, 1998 ("Defs.' Ex. K"), at 129. Their floats typically parodied a television show or movie, sometimes depicting the negative stereotypes of a particular racial, ethnic or religious group in the process. *See* Steiner's Joint Pre–Trial Order ("Steiner JPTO") at 2; Walters' Joint Pre–Trial Order ("Walters JPTO") at 3. In 1996, for example, the group entered a float entitled "The Gooks of Hazard," which parodied the popular television show "The Dukes of Hazard," as well as a number of disparaging Asian–American stereo-

types.[1] *See* Defs.' Ex. K at 132. In 1997, the group's float was titled "Dysfunctional Family Feud," which was based on the television game show "Family Feud" and satirized a community rivalry between the Broad Channel Volunteer Fire Department and the Broad Channel Athletic Club. *See id.* Prior to 1996, the group's floats included such religiously-focused parodies as "Hasidic Park," in 1994, which parodied the movie "Jurassic Park" by depicting Hasidic Jewish men living in prehistoric times, and "The Blast Supper," in 1993, which parodied the final night Jesus Christ is believed to have spent with his apostles before his crucifixion, portraying it as a night filled with debauchery. *See id.* at 130, 131.

Each year, a panel that included local politicians awarded prizes in a variety of categories to that year's participants. *See* Defs.' Exhibit F, Transcript of Disciplinary Trial of Officer Locurto, Oct. 5, 1998 ("Defs.' Ex. F") at 39. The group with which plaintiffs participated had won the prize for "Funniest Float" for the past nine (9) years, including in 1996 with "The Gooks of Hazard." *See* Defs.' Ex. K at 48.

Plaintiffs Joseph Locurto, a police officer in the New York City Police Department (the "NYPD"), and Robert Steiner and Jonathan Walters, firefighters in the New York City Fire Department (the "FDNY"), all participated in the 1996 and 1997 floats. *See* Locurto's Joint Pre–Trial Order ("Locurto JPTO") at 3; Steiner JPTO at 2; Walters JPTO at 3. There was no evidence at trial that either of those floats generated substantial media coverage or caused any disruption within or without the NYPD or FDNY. On Monday,

September 7, 1998, plaintiffs participated in yet another float in the annual parade. *See* Trial Transcript of Bench Trial, January 7–9, 2003 ("Tr."), at 55. Plaintiffs were not dressed in uniform throughout the parade; they participated in their individual capacities as members of the community. *See* Locurto JPTO at 4; Steiner JPTO at 3; Walters JPTO at 4.

The float at issue in this case was entitled "Black to the Future: Broad Channel 2098." It was a take-off on the late–80's movie, "Back to the Future," and portrayed a number of offensive stereotypes about African–Americans. *See* Locurto JPTO at 7. Participants rode through the parade atop a flatbed truck donning black "Afro" wigs made from mops and having covered their faces with black lipstick, appearing in so-called "black-face." *See* Steiner JPTO at 6. The participants' dress ranged from overalls without an undershirt, to cut-off jean shorts and ratty t-shirts, to athletic-style sweat pants and sweatshirts. Their attire was uniformly slovenly. A large bucket of Kentucky Fried Chicken and watermelons were present on the float, the latter of which at least one participant ate, throwing the remains into the crowd. *See id.* at 6. Plaintiff Locurto denies having thrown anything off the truck. *See* Tr. at 46.

During the course of the parade, the individuals on the float, including plaintiffs, engaged in several chants, such as "No justice, no peace," referring to an oft-heard chant at civil-rights era rallies; "We didn't land on Broad Channel, Broad Channel landed on us," a play on the expression "We didn't land on Plymouth Rock, Plymouth Rock landed on us"; and

---

**1.** The float included a cardboard car labeled "The General Ree," a take-off on the show's famous "General Lee" and the pronunciation of which was intended to mock an Asian immigrant's stereotypical accent. Additional-

ly, the float's participants wore straw hats and glasses (the latter doctored to give the appearance of nearly-closed eyes), threw white rice into the crowd and waved chopsticks. *See* Defs.' Ex. F at 143–53.

"This isn't Johannesburg." *See* Locurto JPTO at 5. Additionally, although plaintiff Locurto denies having done so, other individuals on the float, including plaintiffs Steiner and Walters, also yelled "Crackers, we're moving in!" *See* Locurto JPTO at 4; Walters JPTO at 4. Intermittently throughout the parade, the participants cheered as plaintiff Walters simulated "break dancing" alongside the float. *See* Tr. at 151–52.

Near the end of the parade, and without the knowledge of the other plaintiffs, plaintiff Walters continued his antics by hanging by his hands off the back of the truck for approximately ten (10) seconds in a manner reminiscent of the dragging death of James Byrd, Jr. in Jasper, Texas, in 1998, *see* Locurto JPTO at 5; Steiner JPTO at 3; Walters JPTO at 4, where three (3) white men dragged Mr. Byrd, an African–American man, behind a truck with a rope tied around his ankles. Immediately before this display, Walters stated, "Look what they did to our brother in Texas, we would not allow them here . . . ." Tr. at 137. Shortly after returning to the bed of the truck, plaintiff Walters repeated the above-described display, allegedly at the urging of a cheering crowd and cameramen. *See id.* at 136.

Plaintiff Joseph Locurto is a life-long resident of Broad Channel, Queens. *See* Locurto JPTO at 2. He was a police officer with the NYPD from February 1994 until his termination on October 10, 1998. *See id.* During this time, Locurto was assigned to the 104th Precinct in Queens, a racially-mixed precinct. *See id.* Locurto

consistently received positive reviews from his supervisors, most recently being rated as "highly competent" in the category of "Community Interaction" in December 1997.[2] *See id.* at 3. Locurto also received a commendation for assisting in the apprehension of a fleeing felon. *See id.*

Plaintiff Walters is also a life-long resident of Broad Channel; plaintiff Steiner has lived in Broad Channel since 1996. *See* Steiner JPTO at 2; Walters JPTO at 2. Both were employed by the FDNY until their termination on October 26, 1998. *See id.* Steiner joined the FDNY in 1996, serving most recently as a firefighter of Ladder 17 in the South Bronx, a ninety-eight percent (98%) minority community. *See* Steiner JPTO at 2. During his time with the FDNY, Steiner never had any problems with the community in which he served or the firefighters with whom he worked. *See* Defs.' Ex. K at 214–15 (Test. of Captain Tuberty). He also received uniformly excellent performance reviews from his supervisors. *See id.*

Plaintiff Walters joined the FDNY in 1990 and worked in Engine Company 231 in the Brownsville section of Brooklyn, a predominantly African–American and Hispanic neighborhood, for the three (3) years preceding his termination. *See* Defs.' Ex. K at 273–74. Throughout his time in Brownsville, Walters similarly received satisfactory or higher evaluations and had no difficulty with any of his fellow firefighters, who were also racially diverse, or members of the community. *See* Defs.' Ex. K at 273–76 (Test. of Capt. Higgins). Steiner and Walters participated in the

---

**2.** In February 1995, Locurto's NYPD supervisor noted that "Officer Locurto is courteous and considerate when dealing with the public" and that he "addresses supervisory officers with respect and interacts well with his peers." *Id.* at 2. A similar review that took place ten (10) months later noted "Police Officer Locurto gets along well with his peers and

supervisors. He displays a willingness to learn and possesses a professional demeanor." *Id.* Finally, in 1996, the NYPD evaluator and Locurto's commanding officer reported that Locurto "is professional in his interaction with prisoners" and that he "comports to dept regulations, policies, regarding polic[e] ethics/integrity." *Id.* at 2–3.

parade with roughly the same individuals for the past nine (9) years.

On Sunday, September 6, 1998, plaintiffs Locurto and Walters attended a barbeque to discuss their participation in the annual parade, which was scheduled to take place the following day. *See* Locurto JPTO at 3; Steiner JPTO at 3; Walters JPTO at 3. The group considered the possibility of entering two floats–one portraying negative Italian–American stereotypes; the other African–American stereotypes. *See* Locurto JPTO at 3. When plaintiffs, including Locurto, an Italian–American, left the gathering, they understood that the group intended to enter a float entitled "Gottizilla," which would parody the movie Godzilla and caricature Italian–Americans.[3] *See* Locurto JPTO at 3; Steiner JPTO at 3; Walters JPTO at 3. However, when plaintiffs arrived at the parade staging area the following day at approximately 12:30 p.m., they discovered that the group would instead be entering a float entitled "Black to the Future: Broad Channel 2098," the African–American–focused float discussed the previous night. *See* Locurto JPTO at 4; Steiner JPTO at 3; Walter JPTO at 3–4. According to plaintiffs, the theme of the float was changed because the participants were unable to complete the "Gottizilla" float in time for the parade. *See* Steiner JPTO at 6.

The parade commenced at approximately 1:30 p.m. Plaintiffs' float left the starting point at 2:00 p.m., but never reached the viewing table where the politicians judging the floats were stationed due to an ensuing thunderstorm.

On Tuesday, September 8, 1998, the night following the parade, WCBS–TV aired footage of the "Black to the Future"

float, describing it as racist. *See* Locurto JPTO at 9. On Friday, September 11, 1998, after rumors had surfaced that city employees had taken part in the float, *The New York Times* published a story in which Mayor Giuliani was quoted as saying "I've spoken with Commissioners Safir and Von Essen ... and we all agree that any police officer, firefighter or other city employee involved in this disgusting display of racism should be removed from positions of responsibility immediately.... They will be fired." Answer, Ex. A, David W. Chen, *Officers and Firemen Wore Blackface on Float Officials Say,* September 11, 1998, at B1; Tr. 222–23. At the time he made these undisputed statements, Mayor Giuliani was unaware of the specific identities of any city employees who participated in the float. *See* Tr. at 238.

Plaintiff Locurto first learned that the NYPD wished to speak with him about his involvement in the parade on the afternoon of Friday, September 11, 1998. *See* Locurto JPTO at 5. That evening, he contacted the NYPD through counsel, informing it that he had, in fact, participated in the "Black to the Future" float. *See id.* at 6. Shortly thereafter, and without any further inquiry into the nature of his involvement, the NYPD suspended Locurto without pay. *See id.* Plaintiffs Steiner and Walters were similarly suspended on September 11, 1998 after appearing voluntarily before Commissioner Von Essen and admitting to their participation in the float. At this meeting, Commissioner Von Essen communicated to plaintiffs Steiner and Walters that he did not want to fire them— but "his hands were tied." *See* Tr. at 366– 67. As discussed more thoroughly below,

---

**3.** The title "Gottizilla" refers to the late John Joseph Gotti, convicted leader of the New York-based Gambino crime family. Presumably, the float would have parodied the nega- tive "gangster" stereotypes depicted in films such as "The Godfather" and "Goodfellas" or, more recently, the cable television show "The Sopranos."

Von Essen's reservations were reaffirmed and memorialized in his 2002 autobiography, "Strong of Heart." Between the date of the parade and their respective suspensions, all three (3) plaintiffs worked their regular shifts without incident.

Following the revelation of plaintiffs' identities, Mayor Giuliani again remarked publicly on the situation. In a *Daily News* story published on Saturday, September 12, 1998, the Mayor, referring to plaintiffs, was quoted as saying "They're technically suspended, but they're never getting back into the Police Department or the Fire Department unless the Supreme Court of the United States ordered us to take them back." Pl. Locurto's Ex. 2 (Gene Mustain, *Float Firefighters Shelved,* Sept. 12, 1998, at 20). Mayor Giuliani does not dispute making this statement.[4]

Mayor Giuliani's statements came only days after having been at the center of another racially-charged controversy involving the NYPD. *See* Pl. Locurto's Ex. 19 (collection of 62 newspaper articles from Sept. 7, 1998 to Sept. 10, 1998). The Mayor received nationwide criticism in the press and from many civil rights activists over the manner in which the NYPD handled a September 5, 1998 demonstration by African–Americans in Harlem, billed as "The Million Youth March." *See id.* Prior to September 5, the Mayor had criticized the event, calling its organizer and main speaker, Kalid Muhammad, a "hatemonger" because the former Nation of Islam official had made comments about Jews and Roman Catholics that the Mayor found offensive. *See id.* Having initially

denied the march organizers a permit, the City then opposed unsuccessfully the organizers' request in federal court for a preliminary injunction ordering the City to issue a permit. *See Million Youth March, Inc. v. Safir,* 63 F.Supp.2d 381, 383 (S.D.N.Y.1999), *prelim. inj. modified,* 155 F.3d 124 (2d Cir.1998). The organizers had asserted that the city's denial of the permit and continued opposition reflected Mayor Giuliani's antipathy to the content or message of the proposed event or, at least, to Mr. Muhammad. *See id.* at 383. The subsequent public controversy, riddled with allegations of racism on the part of the Mayor and the NYPD, involved claims that the NYPD used excessive force to end the rally only minutes after the time allowed under the permit had expired. *See* Pl. Locurto's Ex. 19.

On Monday, September 14, 1998, the NYPD filed the following two (2) charges against Locurto: (1) violating Patrol Guide 104–01, page 3, paragraph 4, ("Specification No. 1"), alleging that he engaged in "conduct prejudicial to the good order, efficiency and discipline of the Department, to wit: said Officer did participate in and appear on a Labor Day parade float which depicted African–Americans in a demeaning and offensive manner"; and (2) violating Patrol Guide 104–01 page 3, paragraph 2(a), ("Specification No. 2"), for "knowingly associating with person(s) or organization(s) advocating hatred, or oppression of, or prejudice toward a racial or religious group." Locurto JPTO at 7.

> The only way this guy gets back on the police force is if the Supreme Court of the United States tells us to put him back.

> Answer, Ex. B, Kit R. Roane, *Suspended Officer Apologizes, Calling Float 'a Big Mistake',* September 13, 1998, at 51.

---

**4.** Nor does the Mayor dispute the following quote attributed to him by *The New York Times* in a September 13, 1998 article:

I'm not going to take the responsibility of keeping him [Locurto] on the force and then three years from now he hurts somebody, and then somebody wants to know why he wasn't removed.

A NYPD disciplinary hearing took place on October 5, 1998 before the Honorable Rae Downes Koshetz, NYPD Deputy Commissioner of Trials. Police Department procedural rules require that the Deputy Commissioner of Trials issue a Report and Recommendation ("R & R") to the Police Commissioner following the conclusion of such a hearing. *See* 38 RCNY § 15–06. The Police Commissioner then makes the final determination after reviewing the R & R and the complete record. *See id.* at § 15–08. The Commissioner may approve or modify the findings of the Deputy Commissioner of Trials, as well as the recommended penalty. *See id.*

At plaintiff Locurto's hearing, the parties submitted two (2) stipulations of fact. The first was that the NYPD had not terminated any police officer solely for having engaged in racially offensive speech or expression since January 1991; the second that the NYPD had no knowledge of any cases in which charges and specifications were filed against an officer alleging violation of Specification No. 1 since January 1, 1980. *See* Defs.' Ex. F at 9–13. Testimony was taken from plaintiff Locurto, as well as from James Trudden, detective with the NYPD and Chief of the Broad Channel Volunteer Fire Department, Dr. James O'Keefe, Director of Training for the NYPD, and Reverend Al Sharpton, President of the National Action Network. *See id.* at 28–240. Plaintiff Locurto had sought leave to depose Mayor Giuliani and Commissioner Safir, but the Deputy Commissioner denied his request. After hearing all the testimony and the parties' closing arguments, Deputy Commissioner Koshetz recommended that Locurto be found guilty of Specification No. 1 but that Specification No. 2 be dismissed. *See* Koshetz R & R at 15. Defendant Commissioner Safir adopted this recommendation, effective October 10, 1998.

Similarly, following their initial suspensions, plaintiffs Steiner and Walters were charged with violating Section 25.1.3 of the Regulations for the Uniformed Force for bringing "reproach and discredit to the Fire Department, violat[ing] their oaths of office, and engag [ing] in conduct which aroused racial hatred." Steiner JPTO at 3; Walters JPTO at 4. All FDNY hearings are conducted before an Administrative Law Judge ("ALJ") at the Office of Administrative Trials and Hearings ("OATH"). *See* 3 RCNY § 2–01. Following the hearing, the presiding ALJ submits a record of the hearing along with a R & R to the Fire Commissioner. *Id.* As with the NYPD, the ultimate determination on guilt and the appropriate penalty is reserved for the department's Commissioner. *See id.* Accordingly, an OATH hearing was held before ALJ Rose Marie Maldonado on October 6 and 7, 1998.

At the hearing, the FDNY called several witnesses from within the department, including William Feehan, First Deputy Commissioner, and Chief Steven Derosa, former Chief of Training for the FDNY, as well as Detective James Trudden, Chief of the Broad Channel Volunteer Fire Department. Commissioner Feehan testified generally to his opinion of the public's reaction to the Broad Channel incident and how it could potentially impact minority recruiting, community relations, and department morale. *See* Defs.' Ex. K at 173–83, 191–95. Detective Trudden testified to the float's impact on the Volunteer Fire Department, citing non-specific hostile phone calls and the media's labeling of the department and the town as racist. *See id.* at 54. In presenting their case, in addition to their own testimony, plaintiffs called seven (7) firefighters with whom they had worked prior to their suspensions (four (4) in the case of plaintiff Steiner; three (3) in the case of plaintiff Walters). All seven, including two (2) who were Afri-

can–American, testified that they never witnessed any racist conduct by plaintiffs, either on or offduty, and do not consider them to be racists. *See id.* at 215, 224–25, 227–28, 231, 280, 283–84, 291. The firefighters also testified uniformly that they would welcome the opportunity to work with plaintiffs again and foresaw no difficulty if they were to return to the department. *See id.* Captain Robert Higgins similarly testified with respect to plaintiff Walters, whom he had supervised at Engine Company 231 and evaluated in the past. *See id.* at 276–77. Prior to the start of the trial, plaintiffs' had sought permission from ALJ Maldonado to call both Mayor Giuliani and Commissioner Von Essen as part of their case-in-chief. ALJ Maldonado denied plaintiffs' request, concluding that any testimony offered would be only marginally relevant and easily attained, in substance, through other means. *See id.* at 164–65.

In her R & R, ALJ Maldonado recommended that the charge for "arous[ing] racial hatred" be dismissed. *See* Maldonado R & R at 28. She found plaintiffs guilty, however, of "bringing reproach and discredit to the Fire Department and for violating the oath of office." *See id.* ALJ Maldonado initially concluded that plaintiffs' speech was not "on a matter of public concern" but nonetheless went on to find that the FDNY offered legitimate reasons for terminating Steiner and Walters and that they were not fired in retaliation for the content of their speech. *See id.* at 28–29. Although on this charge ALJ Maldonado eventually recommended that Steiner and Walters be terminated, *see id.* at 28, 30, she stated in her R & R that she believed a penalty of three (3) months suspension was more appropriate given the facts. She explained, however, that she was confined by regulation to only three (3) penalty options–reprimand, loss of ten days pay or dismissal. *See id.* at

28–29. Despite her reservations, Commissioner Von Essen adopted Maldonado's R & R and terminated Steiner and Walters, effective on October 26, 1998. *See id.*

In September 1998, following their terminations, plaintiffs Locurto, Steiner and Walters each brought suit pursuant to 42 U.S.C. § 1983, alleging they were terminated illegally from their positions of public employment–specifically, that they were terminated without due process of law and in retaliation for engaging in offensive speech. The three (3) cases were consolidated; subsequently, the complaints were amended to add pendent state law claims.

Prior to any discovery, the parties fully briefed and argued cross-motions for summary judgment. On April 27, 2000, the Court denied both parties' motions in a written opinion and order. *See Locurto v. Giuliani,* 95 F.Supp.2d 161 (S.D.N.Y.2000). Based on the denial of their defense of qualified immunity, defendants filed an interlocutory appeal to the United States Court of Appeals for the Second Circuit on May 12, 2000.

After first establishing that it had jurisdiction to hear defendants' appeal, the Second Circuit held that the available post-termination options were sufficient for procedural due process purposes, thus warranting dismissal of plaintiffs' due process claim. *See Locurto v. Safir,* 264 F.3d 154, 173–75 (2d Cir.2001) (concluding that failure to afford neutral adjudicator at pretermination hearings did not violate procedural due process, given availability of adequate post-deprivation hearing under New York's Article 78 in which plaintiffs could have raised claims that agency adjudicator was biased and prejudged outcome). With respect to plaintiffs' § 1983 retaliation claim, however, the court determined that it did not have jurisdiction over that portion of defendants' appeal because the va-

lidity of plaintiffs' claim—more specifically, the issue involving defendants' motive in terminating plaintiffs—turned on an issue of fact rather than law. *See id.* at 166–70. The court, therefore, dismissed that portion of defendants' appeal.

A bench trial commenced before this Court on the issue of liability on January 7, 2003, and the parties filed post-trial memoranda of law. The Court heard testimony from all parties, as well as from Lynn Tierney, former Deputy Commissioner of Internal Affairs for the FDNY and Sheldon Wright, former Director of Employment Initiatives for the FDNY.

## DISCUSSION

Plaintiffs claim that their participation in the "Black to the Future: Broad Channel 2098" float was a comment on racial integration of a white community for the purpose of entertainment and, as such, was protected by the First Amendment. Regarding their subsequent termination, plaintiffs maintain that defendants did not dismiss them out of a reasonable concern for anticipated disruption but rather in retaliation for the content of their speech. Finally, to the extent the Court determines that plaintiffs' termination was not motivated by retaliation or was otherwise pretextual, plaintiffs urge that their termination was nonetheless impermissible because, given the circumstances, any concern over disruption was insufficient as a matter of law.[5]

Defendants counter that, as an initial matter, plaintiffs' First Amendment claims are barred by the doctrine of collateral estoppel based on the factual findings and determinations of law made during their disciplinary hearings. Alternatively, defendants argue that plaintiffs' purported speech is not a matter "of public concern," as required by the Supreme Court, and, therefore, not entitled to First Amendment protection. Furthermore, defendants argue that even if plaintiffs' speech is protectable, defendants' concern over potential disruption was reasonable and sufficient, as a matter of fact and law, to justify plaintiffs' terminations. To this end, defendants rely particularly on the Second Circuit's recent decision in *Pappas v. Giuliani*, 290 F.3d 143 (2d Cir.2002).[6]

For the reasons set forth below, the Court concludes that plaintiffs' First Amendment claims are not barred by collateral estoppel. The Court further concludes that plaintiffs' participation in the Broad Channel Labor Day parade constituted speech on a matter of public concern and is therefore entitled to protection under the First Amendment, and that plaintiffs were terminated in response to the offensive content of their speech. Even if plaintiffs' terminations arose out of a genuine concern for potential disruption, the Court finds defendants' concern was unreasonable and, in any event, insufficient, as a matter of law, to outweigh plaintiffs' constitutionally protected free speech rights.

### I. Collateral Estoppel

Defendants contend that the doctrine of collateral estoppel bars plaintiffs from relitigating the findings of fact and determinations of law made by the Deputy Commissioner for Trials in the case of plaintiff

---

5. Plaintiffs also allege that in terminating plaintiffs, defendants acted arbitrarily, in violation of Article 78 of New York state law. *See Locurto,* 264 F.3d at 174 (explaining Article 78 proceedings).

6. Defendants also maintain in their post-trial brief that defendants enjoy qualified immunity to the extent they are being sued in their individual capacities; and that it is inappropriate for the Court to exercise supplemental jurisdiction over plaintiffs' Article 78 claims.

Locurto and the ALJ in the case of plaintiffs Steiner and Walters.

■ Collateral estoppel, also known as issue preclusion, is the procedural doctrine that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). The doctrine is intended to preclude parties from contesting matters that they have had a full and fair opportunity to litigate and prevent judicial inefficiencies such as multiple lawsuits and inconsistent decisions. *See Montana v. United States*, 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). With respect to administrative findings of fact, in *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the Supreme Court held that as a matter of federal common law, "when a state agency acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate ... federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts." 478 U.S. at 799, 106 S.Ct. 3220 (internal quotations and citations omitted); *see also Doe v. Pfrommer*, 148 F.3d 73, 79 (2d Cir.1998) (stating that the Supreme Court in *Elliott* "expressly found that issue preclusion based on unreviewed state agency [fact] determinations is appropriate in § 1983 civil rights actions"). Accordingly, if plaintiffs' administrative proceedings afforded them a "full and fair opportunity" to litigate their First Amendment claims, it is clear that any disputed issues of fact resolved by the Commissioner or ALJ are preclusive in this action. What remains less clear is whether any *legal* determinations made by the Commissioner or ALJ in the context of plaintiffs' disciplinary proceedings are similarly preclusive.

The question of whether unreviewed administrative determinations of law are entitled to collateral estoppel in a subsequent federal action is undecided, as yet, in this Circuit, and has resulted in a split amongst the other Circuits. *Compare, e.g., Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 192–93 (3rd Cir.1993) ("It is the legal issue, the Commission's constitutional ruling, that we think is beyond the scope of the Elliott holding"), *with Eilrich v. Remas*, 839 F.2d 630, 632–33 (9th Cir.1988) (upholding issue preclusion of administrative determination on First Amendment issue in § 1983 action relating to police officer's dismissal for insubordinate speech). Although the Second Circuit has not ruled squarely on this issue, the district court in *Pappas v. Giuliani*, faced with a factual situation nearly identical to that here, thoroughly surveyed the legislative history of § 1983 and the relevant Supreme Court case law and concluded that preclusive effect should not be given to legal declarations. *See* 118 F.Supp.2d 433, 437–43 (S.D.N.Y.2000) ("[A]llowing issue preclusion for unreviewed administrative decisions would effectively deny [§ 1983 litigants the] opportunity to have [their] federal constitutional claims adjudicated in federal court.").[7]

*Pappas* involved a police officer charged with mailing racist propaganda. The offi-

---

**7.** In its subsequent opinion in *Pappas,* the Second Circuit chose not to address directly the propriety of the district court's conclusion. Instead, the Second Circuit went on to resolve the merits of plaintiff's First Amendment claim, and therefore assumed that plaintiff's § 1983 action was not barred by collateral estoppel. *See Pappas v. Giuliani, et al.,* 290 F.3d at 145 n. 1.

cer was terminated following an NYPD disciplinary trial, in the course of which the Deputy Commissioner rejected his First Amendment retaliation claim. The officer had the opportunity to contest the Commissioner's legal determinations by bringing a subsequent Article 78 action but did not do so. In concluding that preclusion was not appropriate with respect to the Commissioner's legal determinations, the court stressed Congress' broad remedial aims in passing § 1983, *see id.* at 438–40 (numerous Supreme Court citations omitted), as well as the Supreme Court's concomitant recognition of Congress' intent, for example, by refusing to fashion a common law procedural rule requiring plaintiffs to exhaust their administrative remedies prior to bringing a federal action. *See id.* at 438–41 (citing *Patsy v. Board of Regents,* 457 U.S. 496, 503–07, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)). The Court's rejection of an exhaustion requirement, the district court noted, was based on a principle applicable to the instant issue, as well—namely, that "federal common law procedural hurdles capable of precluding § 1983 actions should not be erected without clear evidence of Congressional intent." The court found that there was no basis to find that intent. *See id.* at 441.

The district court in *Pappas* also cited the specific, limiting reference to administrative fact-finding in the Supreme Court's decisions on issue preclusion, *see id.* at 441–42 (citing *Elliott,* 478 U.S. at 797–99, 106 S.Ct. 3220), as well as its recognition of the special expertise and responsibility the federal courts hold in adjudicating federal constitutional matters, particularly those involving the First Amendment. *See id.* at 440, 442 (discussing *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984)). Regarding the officer's failure to bring an Article 78 proceeding, the district court observed that because he was facing termi-

nation, he did not choose, "in any meaningful sense," to bring his First Amendment claim in the state administrative proceeding. *See id.* at 439. "Section 1983's 'nonexhaustion' requirement and Congress's commitment to providing a federal forum for constitutional relief would ring hollow if an individual could be forced to litigate his claim before the very agency (in this case, the police department) he claims violated his constitutional rights." *Id.* at 339–40, 104 S.Ct. 1799.

■ Although the Court concurs with the district court's analysis, and that of the Third Circuit, it need not decide that legal issue because it concludes that plaintiffs did not receive a "full and fair opportunity" to litigate their First Amendment claims in the course of their respective administrative proceedings. *See Colon v. Coughlin,* 58 F.3d 865, 869 (2d Cir.1995). Most notably, plaintiffs were deprived of a full opportunity to adjudicate their claims by the Deputy Commissioner's refusal to permit discovery into the Mayor and Commissioner Safir's motives in terminating plaintiffs and the ALJ's refusal to allow the Mayor and Commissioner Von Essen to testify. As this Court previously found when ruling on plaintiffs' request to enjoin the administrative proceedings, *see Locurto v. Giuliani,* T.R.O. Hr'g Tr. at 33–37 (S.D.N.Y. Sept. 15, 1998), far from being "marginal," such discovery and/or testimony is relevant and necessary to plaintiffs' case; indeed, it plays a crucial role in the Court's findings with respect to defendants' motivations and the timing of the decision-making process, as discussed below. A full adjudication of plaintiffs' current claims, moreover, was not possible in the course of their administrative proceedings given the unique facts and allegations in this case. At the heart of plaintiffs' claim is that defendants had a retaliatory motive in terminating them. The Second

Circuit implicitly recognized this point in sending the case back for trial.[8]

The Court holds, therefore, that plaintiffs did not receive a "full and fair opportunity" to adjudicate their First Amendment claims at their respective administrative trials and, thus, any administrative findings made therein–factual or legal–are not entitled to any preclusive effect. The Court now turns to the merits of plaintiffs' claims.

## II. First Amendment Retaliation Claim

The Supreme Court has long held that when the government acts as an employer it has far broader powers than when it acts as a sovereign. *See Waters v. Churchill,* 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). At the same time, however, the government is not permitted to chill the First Amendment rights of its employees through fear of retaliation. *See Pickering,* 391 U.S. at 572, 88 S.Ct. 1731; *Locurto,* 264 F.3d at 166 (citing *Waters,* 511 U.S. at 668, 114 S.Ct. 1878); *see also Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (quoting *Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) ("[C]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights.")). While, as Justice Holmes aptly noted, a policeman "may have a constitutional right to [speak his mind], but he has no constitutional right to be a policeman," *McAuliffe v. Mayor, etc., of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517 (1892), the Supreme Court has since rejected the notion that public employees forfeit their constitutional rights, stating that the government cannot condition public employment on the infringement of an employee's constitutionally protected interest in freedom of expression. *See Berger v. Battaglia,* 779 F.2d 992, 997–98, *cert. denied,* (4th Cir. 1985) (quoting *Connick,* 461 U.S. at 142–43, 103 S.Ct. 1684).

■ Therefore, in *Pickering v. Board of Education,* the Court held that to sustain a claim of retaliatory discharge based upon infringement of free speech, a government employee must establish, by a preponderance of the evidence, that what he said or did was a matter of public concern, and that his speech was a motivating factor in the adverse action taken by the government employer. *See* 391 U.S. at 572–73, 88 S.Ct. 1731. If the employee makes such a showing, the government can nonetheless avoid liability if it can show that the employee's speech would disrupt the government's activities and that such disruption is sufficient to outweigh the First Amendment value of the employee's speech. *See id.* Alternatively, the government employer can demonstrate that it would have taken the same adverse action against the employee in the absence of the protected speech. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

■ Based on *Pickering* and its progeny, the Second Circuit has developed a three-part test to analyze whether a gov-

---

**8.** Finally, the Court's findings on defendants' motivations and the timing of the decision-making process also require a finding as to whether defendant Commissioners were neutral decision-makers, as required by law. *See Colon,* 58 F.3d at 871.

ernment employee's termination was constitutional. A government employer may fire an employee for speaking on a matter of public concern if: (1) the employer's prediction of disruption was reasonable; (2) the potential disruption is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for his speech. *See Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir.1995) (citing *Waters*, 511 U.S. at 668, 114 S.Ct. 1878); *Locurto*, 264 F.3d at 166. The above test is intended to reflect the court's task of "arriv[ing] at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S at 568, 88 S.Ct. 1731; *Connick*, 461 U.S. at 140, 103 S.Ct. 1684.

At the outset, the Court notes that the facts of the instant case fall outside the paradigmatic fact pattern from which *Pickering* and its progeny were derived. Although the Court has crafted an exception within its First Amendment jurisprudence whereby public employees have reduced free speech rights under certain circumstances, all of its decisions in this area have involved speech that either took place in the workplace or concerned a subject germane to workplace policy or functioning. *See Waters*, 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (addressing dismissal of nurse for workplace discussion with co-worker criticizing hospital department and supervisor); *Rankin*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (addressing dismissal of employee in state law enforcement office for workplace remark wishing President would be assassinated); *Connick*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (addressing dismissal of employee in district attorney's office

for criticizing supervisors and office policies and circulating disrupting questionnaire to fellow employees); *Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (addressing dismissal of teacher for making statements in private to principal about discriminatory school district policies); *Mt. Healthy Sch. Dist.City Bd. of Educ.*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (addressing dismissal of teacher for disclosing to radio station substance of principal's memorandum about school policies); *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (addressing dismissal of teacher for sending letter to local newspaper critical of school board and superintendent's past handling of revenue raising). When balancing the parties' interests, therefore, the Supreme Court has viewed the public employer's interest to be especially significant where there are direct risks to internal relationships and operational efficiency that result from employee speech that is critical of supervisory personnel or workplace policy and that occurs in the context of the workplace. *Compare Waters*, 511 U.S. at 680–81, 114 S.Ct. 1878 (discharge permissible where employee's on-the-job speech sought to discourage other employees from working in particular department and undermine management's authority) *and Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684 (discharge permissible where employee's work-related, on-the-job speech was reasonably viewed as causing "mini-insurrection"), *with Givhan*, 439 U.S. at 415–16, 99 S.Ct. 693 (discharge impermissible solely for private, work-related confrontation with supervisor); *and Pickering*, 391 U.S. at 574, 88 S.Ct. 1731 (discharge impermissible where off-duty employee sent letter to newspaper criticizing employer on important matter of public policy). The Court has never extended

its decision in *Pickering* to apply to expressive activity engaged in by public employees that did not take place in the workplace or address matters of internal workplace functioning or policy. *Cf. Bonds v. Milwaukee County,* 207 F.3d 969, 976 (7th Cir.2000), *rehearing and rehearing en banc denied,* (9th Cir.2000), *cert. denied,* 531 U.S. 944, 121 S.Ct. 340, 148 L.Ed.2d 273 (2000) ("Speech by government employees, completely divorced from the employment context, is protected under the same standard as speech by those who are not government employees." (citing *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967))).

Despite the unique factual context in which the instant case arises, *Pickering's* underlying constitutional principles are still relevant and controlling here. With this in mind, the Court turns to *Pickering's* threshold inquiry of whether plaintiffs' speech was on "a matter of public concern."

## A. "Of public concern"

There is no dispute that plaintiffs were terminated as a result of their participation in the "Black to the Future: Broad Channel 2098" float and would not have been terminated but for their participation. Defendants claim, however, that the Court need not embark on a *Pickering*-style analysis because plaintiffs' participation in the Labor Day float does not satisfy *Pickering's* threshold requirement–namely, that the conduct in question be "fairly characterized as constituting speech on a matter of public concern." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. According to defendants, "[p]laintiffs' conduct during

the Parade is ... devoid of any credible intention to address a matter of public concern, in a *Connick* sense." Defs.' Post–Tr. Mem. at 28. The Court disagrees.

■■■ Whether an employee's speech addresses a matter of public concern rather than one of purely private interest "must be determined by the content, form, and context of a given statement as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. To fall within the realm of "public concern," moreover, an employee's speech must "relat[e] to a ... matter of political, social, or other concern to the community." *Id.* at 146, 103 S.Ct. 1684. The inappropriate or controversial character of a statement is irrelevant to the issue of whether it deals with a matter of public concern. *Rankin,* 483 U.S. at 386, 107 S.Ct. 2891; *see also Jeffries v. Harleston,* 21 F.3d 1238, 1245–46 (2d Cir.1994) (stating, in case involving racially offensive speech, "First Amendment protection does not hinge on the palatability of the presentation; it extends to all speech on public matters, no matter how vulgar or misguided"), *vacated and remanded on other grounds,* 513 U.S. 996, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994), *rev'd on other grounds,* 52 F.3d 9 (2d Cir.), *cert. denied,* 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 114 (1995).

■■■ In this case, after considering the testimony of all three (3) plaintiffs, the Court finds that plaintiffs' float had two aims: to comment on the future racial integration of Broad Channel, a predominately white community during the relevant time, and win the prize for funniest float, a prize the group had won in the past with other ethnicity-parodying floats. *See* Tr. at 93, 106, 110–11 (Walters); 131, 133–35, 150–51 (Steiner); 45, 62–63 (Locurto).[9]

9. Defendants make much of the fact that plaintiffs' after-the-fact explanations of the

float's intended message evince a lack of a common understanding. Defendants cite no

At the outset, the Court notes that the expressive nature of plaintiffs' conduct is well established. Plaintiffs chose to participate in a public parade, which the Supreme Court has held is inherently expressive activity, *see, e.g., Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 568–69, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995); furthermore, they wore costumes as part of their publicly-displayed message, also deemed expressive conduct, *see, e.g., Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505–06, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). As for whether plaintiffs' speech constitutes a matter of public concern, the Court concludes that the long, continuing debate over the desirability of community racial integration in this country permits no doubt that the topic is a matter of important political and social concern to the community, regardless of which side of the debate is being represented.[10] *See also Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684 (recognizing issues of race relations and discrimination to be "inherently of public concern"); *Jeffries*, 21 F.3d at 1245 (holding that professor's

case law, however, for the notion that every individual involved in an exercise of group expression must share–and be able to articulate–an identical understanding about the exact nature of that expression or, as defendants suggest, demonstrate a "meeting of the minds." *See generally, Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569–70, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) ("[A] private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech."). What is important for the Court's purposes are plaintiffs' words and actions during the parade and whether the resultant message, viewed in context, was regarding a matter of political, social, or other concern to the community or instead reflected merely personal concerns, such as work-related grievances between an employer and employee. *See Connick*, 461 U.S. at 148, 103 S.Ct. 1684.

10. To date, some scholars and observers, particularly within the African–American community, question the efficacy and necessity of pursuing a voluntary community integrationist strategy, at least as the central tenet of a modern civil rights agenda. *See, e.g.,* Roy L. Brooks, *Integration or Separation: A Strategy for Racial Equality* (1997) (arguing for limited "cultural and economic integration" while simultaneously promoting separate schooling, housing and business enterprises to bolster community self-sufficiency); Wil Haygood, et al., *Rethinking Integration*, Boston Globe, Sept. 14–17, 1997 (four (4)-part series reporting views of some in black community on ideal and effectiveness of voluntary integration vis-a-vis business opportunities, community gentrification and education); *see generally* Derrick A. Bell, *Serving Two Masters: Integration Ideals and Client Interests in School Desegregation*, 85 Yale L.J. 470 (1976), *reprinted in Critical Race Theory* 5 (Kimberlé Crenshaw, et al. eds., 1995). The Second Circuit itself has ruled in a case involving the debate over community racial composition, specifically, the phenomenon known as "tipping." *See United States v. Starrett City Assoc.*, 840 F.2d 1096 (2d Cir. 1988). Furthermore, some see voluntary community integration as a potential danger to minority communities because of its tendency to weaken minority political power. *See, e.g.,* Joe Hicks, *The Changing Face of America*, L.A. Times, July 20, 1997, at A1 (describing "growing sentiment in black communities that racial integration may not be a worthy or desirable goal" in light of country's changing demographics and stating that "[m]any African–Americans fearful of falling off the political radar screen are leaning forward, if not embracing, separatism as a way to protect and build upon African American gains"). The Supreme Court has implicitly recognized the political benefits of uniformly ethnic communities in its gerrymandering cases. *See Miller v. Johnson*, 515 U.S. 900, 944, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (Ginsberg, J., joined by Stevens, Breyer & Souter, JJ., dissenting) (citing social science literature in concluding that "ethnicity is a significant force in political life"; therefore, creating ethnic districts is "not ordinarily viewed as offensive or derogatory to those included in the delineation"). *Id.* at 944–45, 115 S.Ct. 2475.

inflammatory anti-semitic remarks at festival were of public concern). Accordingly, plaintiffs satisfy *Pickering's* threshold requirement. *See O'Connor v. Steeves, et al.*, 994 F.2d 905, 913–14 (1st Cir.1993) (noting that "where public employee speaks out on topic which is clearly a legitimate matter of inherent concern ... the court may eschew further inquiry to employee's motives as revealed by 'form and context' of the expression"); *accord Breuer v. Hart*, 909 F.2d 1035, 1039 (7th Cir.1990).

 That plaintiffs may have been additionally motivated by an ill-conceived desire to be humorous, is of no consequence. An individual's personal motives for speaking do not dispositively determine whether that individual's speech addresses a matter of public concern. *Cf. Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir.1999) (stating that motive can be evidentiary on whether speech was calculated to redress personal grievances or for larger, public purpose). As a number of circuit courts have opined, a contrary rule focused on the speaker's subjective motivation would be in direct conflict with the Court's holding in *Connick*. *See, e.g., Azzaro v. County of Allegheny*, 110 F.3d 968, 978 (3d Cir.1997) (en banc); *Chappel v. Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564, 574 (6th Cir.1997). In *Connick*, a public

employee disseminated a questionnaire "to gather ammunition for another round of controversy with her superiors" because she was "dissatisf[ied] with a transfer." 461 U.S. at 148, 103 S.Ct. 1684. Notwithstanding the fact that this personal grievance motivated the entire questionnaire, the Court concluded that "[o]ne question in [the] questionnaire ... touch[ed] upon a matter of public concern." *Id.* at 149, 103 S.Ct. 1684. If the Court viewed motive as dispositive, its decision could only have resulted in a finding that either all of the speech in question was of public concern, or that none of it was. Furthermore, an approach so focused on the speaker's intent would be inconsistent with the broader purposes of the First Amendment, which are concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information. *See, e.g., Connick*, 461 U.S. at 149, 103 S.Ct. 1684.[11]

Finally, defendants' attempt to analogize the speech at issue in this case to that in *Pappas* is without merit. *Pappas* involved an NYPD police officer who sent hundreds of anonymous, racist mailings to charitable organizations from which he received mass mailings. *See Pappas*, 118 F.Supp.2d at 435–36. In holding that such speech was not on a matter of public concern, the

---

**11.** Even if plaintiffs' speech is categorized as mere entertainment, parody or satire, it is not, of course, thereby deprived of meaningful First Amendment protection. *See Berger*, 779 F.2d at 999 (citing *Stanley v. Georgia*, 394 U.S. 557, 566, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)); *Hustler Magazine v. Falwell*, 485 U.S. 46, 57, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Parody, satire or humor as a method of addressing matters of public concern, in addition to being no less entitled to constitutional protection than more serious discourse, is frequently more effective. See, for example, Jonathan Swift, *A Modest Proposal for Preventing the Children of Ireland From Being a Burden to their Parents or Country* 19–31, (William Alfred Eddy, ed., Oxford Univ. Press 1962) (1729), which, in commenting on England's oppression of the Irish, proposed outrageously that the British could most efficiently reduce the Catholic population, and their attendant public burden, by fattening and feeding on the one (1) hundred thousand Irish children upon their reaching one (1) year old. For examples from the more recent past, consider George Bernard Shaw, *Pygmalion* (Dover Thrift 1994) (1916), and the varied writings and statements of Mark Twain and Will Rogers, effectively demonstrating the power of humor and satire when addressed to political and social issues.

district court focused primarily on the fact that Pappas' arguments for why his speech was of public concern were undercut by the private means by which he sought to communicate his purported message. *See id.* at 445–46.

As the court noted, "by his own admission, [Pappas'] motive was to have his name removed from the mailing lists of solicitors." *Id.* at 445. More importantly, the court stressed that "Pappas' anonymous and random mailings were not directed at, and played no part in, the uninhibited, robust, and wide-open debate on public issues" and "[his] purported strategy for addressing a matter of public concern is so plainly unreasonable, it belies his claim that addressing a matter of public concern was ever his intention," or indeed a result reasonably to be achieved by his conduct. *See id.* at 445–46 (internal citations and quotations omitted). Indeed, Pappas' speech would never have even come to garner any public attention but for the department's own internal investigation. *See id.* at 435–36; *see also Pappas,* 290 F.3d at 159 (Sotomayor, J., dissenting).

In the instant case, the contrast with *Pappas* could not be greater. *Accord Pappas,* 290 F.3d at 152 (McMahon, J., concurring) (distinguishing speech in this case with that in *Pappas,* noting, "[t]he civic context of the officers' speech [in Locurto] on this hot-button topic [the effects of racial integration on neighborhoods] made its public concern nature … obvious"). Plaintiffs participated in a public float and addressed their comment on racial integration to the very people representing the interested public, the people of Broad Channel. In any event, the literature involved in *Pappas* contained no message of any kind other than its racist epithets.

Having concluded that plaintiffs' conduct constituted speech on a matter of public concern, the Court turns to the other factors outlined in *Pickering* and by the Second Circuit.

### B. *Pickering* Test

Once it is established that plaintiffs' speech constituted speech on a matter of public concern, under *Pickering,* the Court must determine whether the employer took action against the employee based on the employer's fear of potential disruption or, instead, in retaliation for the content of the employee's speech. If the Court finds that the employer's actions were, in fact, taken out of a fear for disruption, the Court must then ask whether the employer's prediction of disruption was reasonable and whether the fear of such disruption is sufficient to outweigh the value of the employee's speech. Before turning to the question of motivation, the unique facts of this case give rise to two additional and antecedent questions–namely, when was the decision to terminate plaintiffs made and by whom.

In support of their ultimate contention that defendants did not terminate plaintiffs out of a genuine and reasonable concern for disruption, plaintiffs assert that the decision to terminate plaintiffs was made by then-Mayor Giuliani no later than September 10, 1998, not independently by the Commissioners following plaintiffs' disciplinary proceedings. On this point defendants argue that the Mayor did not, and could not under the law, influence or direct plaintiffs' eventual terminations; moreover, defendants maintain that neither the administrative nor trial record permits the drawing of such an inference.

Based on the strength of Mayor Giuliani's contemporaneous public comments, as well as his testimony at trial and that of the Commissioners, the Court finds, as a matter of fact, that Mayor Giuliani made a decision to terminate plaintiffs on or

about September 10, 1998. More specifically, although defendants were fully cognizant of the inter-department disciplinary proceedings that would have to go forward, the Court finds that so long as the initial reports on the nature of the float and plaintiffs' involvement therewith were confirmed through the disciplinary proceedings, it was understood that defendants would terminate plaintiffs. In other words, for all practical purposes, any sanction short of termination was foreclosed.

First, as the Court noted during the trial, the Mayor's testimony indicated that he felt personally responsible for removing from city employment any individuals whose actions he viewed as potentially harmful to the city or its operations. For example, at trial the Mayor testified that one of his concerns upon hearing of the event was future liability to the city if a police officer who had taken part in the float was later charged with some sort of racial misconduct. "[T]he city [would be] on notice," he stated; there is "an obligation to act." Tr. 184–85. The Mayor had stated previously to the press that he was "not going to take the responsibility of keeping him [Locurto] on the force and then three years from now he hurts somebody, and then somebody wants to know why he wasn't removed." He continued, "[t]he only way this guy gets back on the police force is if the Supreme Court . . . tells us to put him back." Tr. at 224. In sum, it seems clear, as the Court noted at trial, that Mayor Giuliani "felt personally

responsible for ridding the Police Department of Officer Locurto." *See* Tr. at 211.

On the question of decision-making, the Mayor himself testified that he was unsure about whether a decision to fire plaintiffs was made at the meeting he called with Commissioners Safer and Von Essen on September 10, 1998.[12] *See* Tr. 224. The Mayor also conceded that Commissioner Von Essen initially had "reservations about the severity of" terminating plaintiffs. *See* Tr. 201–02.

The Mayor's recollection comports with Commissioner Von Essen's own testimony regarding his first impressions of plaintiffs' behavior: "I thought . . . it was a big, big mistake and that they screwed up big time . . . [but] I didn't think at that point that it warranted dismissal. . . ." Tr. at 334. Similarly, when Commissioner Von Essen met with plaintiffs Steiner and Walters on September 11, 1998, he declared that he did not believe that termination was an appropriate response to their actions but had no choice because "his hands were tied," presumably by the Mayor. *See* Tr. 367. Commissioner Von Essen subsequently met again with Mayor Giuliani and expressed his concerns about terminating plaintiffs Steiner and Walters. According to Von Essen, he found the Mayor's comments regarding minority reaction to the float to be persuasive and thereafter changed his view of the situation. *See id.* at 343. Von Essen's testimony suggesting that he was in fact so persuaded is incon-

---

12. Responding to questions about his quote to *The New York Times,* Mayor Giuliani testified as follows:

> Q: But it's your testimony that there was no decision made between you and Commissioners Safir and Von Essen that all three of these individuals [plaintiffs] would be fired and that no decision had been made as of September 10, 1998, is that correct?

> A: I'm not sure about that.
> Q: You're not sure about that; O.K. So, a decision may have been made?
> A: Yes, that doesn't help—all that quote does is create the question in my mind. . . .
> Q: So, you agree that a decision might have been made at the time to fire them.
> A: Or to proceed with firing them.

Tr. at 224.

sistent with his 2002 autobiography, "Strong of Heart: Life and Death in the Fire Department of New York," in which he stated that he had not wanted to dismiss the two (2) firefighters but when he met at City Hall with Mayor Giuliani to discuss the matter, *"he quickly overruled me." See* Pl. Locurto's Ex. 20 at 141 (emphasis added). Indeed, as Von Essen testified, the meeting left him with the distinct impression that the Mayor did not share his view that leniency was appropriate. *See* Tr. 342–43.

The Court finds that Commissioner Von Essen's statements reflect an inherent power dynamic between the Mayor and the Commissioners. Indeed, Commissioner Safir acknowledged that dynamic in responding to a question about the firing of former NYPD Commissioner Bratton:

> I think there are two kinds of power in government. There is real power and reflected power. And the people who have the real power are the people who are elected. And the people who have reflected power are the people who are appointed. And when you confuse those, I think you get into trouble.

Tr. 430. In view of that testimony, it would stretch the limits of common sense to conclude that these two (2) nominally independent Commissioners who served at the Mayor's pleasure would not have understood the consequences of their defiance of the Mayor on an issue as to which he so strongly indicated his preference.

It is clear, therefore, and the Court finds, that the Mayor, through his public and private statements, had foreclosed any sanction other than termination, except in

the event of a mistake regarding the nature of the float or the identity of its participants. Although Giuliani testified that he told the Commissioners to exercise their independent judgment, Tr. 205, and never instructed them to fire plaintiffs regardless of the outcome of the department hearings, Tr. 203–04, the Mayor's statements were envisioning only a scenario where the initial reports on the float and/or its participants had been factually inaccurate.[13] Commissioner Safir similarly testified that as early as September 10, 1998, the only information relevant to his decision to fire plaintiff Locurto was whether Locurto had been accurately identified as a participant in the float, whether he had been coerced into participating in the float, and whether the videotape of the float was doctored. *See* Tr. 449, 450–52. In short, the Court does not find persuasive defendants' position that the Mayor's strong statements to the press, including "[t]hey're not going to be reinstated unless the Supreme Court puts them back on," were intended to mean nothing more than that he "hoped that the eventual outcome ... would be dismissal," and furthermore, that "none of the things [he] said took away from the [Commissioners'] ability to make an independent judgment based on the facts that emerged from the record." Tr. 207.

After close attention to the testimony and demeanor of the relevant witnesses, the Court concludes that as of September 10, 1998, if the facts surrounding the Labor Day float were as initially assumed to be, the Mayor and Commissioners had de-

---

**13.** At trial, the Court asked the Mayor whether he would have been concerned about sending a weak message to the public if, after such strong public proclamations, one (1) of the Commissioners sought to impose a punishment less than termination. The Mayor insisted that he would not, stating, "Then it would be based on facts. . . . Maybe somebody was misidentified on the tape, something was exaggerated, maybe something was misstated. . . . You could say: I was wrong. There was a mistake[.]" Tr. 206–07.

cided that plaintiffs would be terminated.[14]

### 1. *Motive*

Having concluded that defendants made the decision to terminate plaintiffs on September 10, 1998, the Court now turns to the question of defendants' motivation—*i.e.*, whether the termination was based on defendants' reasonable prediction of disruption or in retaliation for the content of plaintiffs' speech or some other impermissible purpose. According to plaintiffs, defendants' decision was motivated by a hostility to the content of plaintiffs' speech and, at least in part, by a desire on the part of the Mayor to garner political goodwill within the city in light of recent events involving charges of racism. Furthermore, as evidence both that defendants were not motivated by a concern for disruption and that even if they were, such concern was not reasonable, plaintiffs point to the lack of information known about plaintiffs and any community reaction to the float at the time such decision was made. Defendants maintain that the decision to terminate plaintiffs was motivated solely by a reasonable concern for potential disruption to the respective departments' missions and morale, as well as to community recruitment efforts.[15] *See* Defs.' Post–Tr. Br. at 35.

At trial, the Mayor testified that his comments endorsing plaintiffs' terminations were based on concerns over "civil unrest," including "people acting out against police officers in other parts of the city," Tr. 174, 183; "exacerbat[ing] friction that already existed between white police officers and African–American police officers," Tr. 182; negative effects on the hiring process, *see id.;* and potential future liability for the city, *see id.* at 184–85. The Court finds, however, the rationales offered by the Mayor five (5) years after-the-fact are not persuasive when considered along with the entirety of the evidence, including the breadth and focus of the statements he issued immediately after receiving notice of the parade.

As already mentioned, when the Mayor first commented publicly on the Broad Channel parade, he was unaware of the specific identities of the city employees who participated. Further, he had not sought information about reaction to the float directly from anyone in the minority community, nor had he received reports from anyone who had. *See* Tr. at 236–37. The Mayor stated emphatically at that time that "any police officer, firefighter, *or other city employee*" involved in the Labor Day parade would be fired. His statement did not reflect a distinction based on the

---

**14.** Although Commissioner Safir insisted that he had in the past—and therefore would have been willing in this case, if he felt it necessary—disagreed with the Mayor regarding matters that the Mayor felt strongly about, the Court cannot accept that testimony as credible, at least in the absence of any other evidence at trial demonstrating that the Commissioner had in fact disagreed with the Mayor on an issue as to which the Mayor's opinion had been so strongly expressed. *See* Tr. 432–33, 459.

**15.** Defendants also claim that plaintiffs' focus on the Mayor's motivations and influence is no more than a restating of plaintiffs' previously-dismissed due process claim and is therefore irrelevant. However, defendants misunderstand the Court's purpose in focusing on these points. As addressed below, the Court's findings regarding the Mayor's role in determining the ultimate sanction for anyone found guilty of participating in the float, and in the timing of that decision, are relevant insofar as they are useful in evaluating the credibility and reasonableness of defendants' assertions that their decisions were motivated by a concern for potential disruption. The mere fact that they may not be legally sufficient to support an independent due process claim does not vitiate their evidentiary relevance on that issue.

differing potential disruption if the speech were undertaken by, say, a janitor working for the city, on the one hand, or a police officer, on the other–or, for that matter, between a police officer and firefighter. This failure to confine his statements to those individuals that actually had contact with the public or maintained a policy or enforcement function within the city, undercuts the contention that his statements were motivated primarily by a concern for civil unrest and/or minority recruiting in the police and fire departments. *See Rankin,* 483 U.S. at 383, 107 S.Ct. 2891. Further, the Mayor's statement goes on to reveal his feeling about the content of plaintiffs' speech, which the Court concludes was the true motivation for plaintiffs' termination–that is, that the float was a "disgusting display of racism" for which any city-employee participants, regardless of their job function, should be fired. At trial, he acknowledged that his statements were intended to create the impression in the minds of the public that the Mayor strongly condemned the Broad Channel float as "offensive" and "outrageous." Tr. 174. Once plaintiffs' identities were confirmed, the Mayor testified that he wanted the public to know that he felt "these people had forfeited ... their right to wear the uniform." Tr. 196.

In light of the Mayor's admitted concern with the public import of his statements, in reaching its conclusion, the Court also credits the circumstantial evidence presented by plaintiffs regarding the near contemporaneous controversy over the Mayor's handling of the Million Youth March. Although the Mayor testified that the situation "played absolutely no role" with respect to the instant matter, *see* Tr. 272, the Court does not find such testimony persuasive, especially considering the manner in which the Million Youth March controversy is tied to the decision-making process in this case by Commissioner Von Essen in his autobiography. In "Strong of Heart," Von Essen included the following discussion about the float situation and the earlier Million Youth March controversy:

> The Mayor had already announced that any city employee involved in that "disgusting display of racism" would be fired. Almost immediately after the story broke, people all over the city were calling for these guys' heads.

> . . . . .

> The float was bad enough in itself, of course. *But the mushrooming story had wider implications that we had to take into consideration.*

> . . . . .

> The Mayor, of course, never liked any story that made New York look bad, and this one definitely did. *He and the police were also sensitive to the constant accusations of racism made against them by community activists and political opportunists.*

> *One week earlier, the Mayor had been roundly criticized in the black community for sending 3,000 cops to the "Million Youth March" rally in central Harlem ....* Before that, he'd strongly criticized the event.... The Mayor had first denied a permit for the march and then tried unsuccessfully to block the march in court, denouncing [Kalid] Muhammad as an "incendiary racist," words that infuriated some activists.

Pl.'s Ex. 20 (emphasis added).

Defendants' contention that they were motivated out of a concern for disruption is further undercut by evidence submitted at trial on the way in which the NYPD has handled other racially-motivated misconduct and controversies in the past. *See Heil v. Santoro,* 147 F.3d 103, 111 (2d Cir.1998) (citing disciplinary custom as evidence of government motive). Plaintiffs

received from the NYPD a summary of all adjudicated and negotiated cases from 1991 to 1998 where the charges and penalties were based, at least in part, on on-duty or off-duty racially-offensive speech or expression. As stipulated to at plaintiff Locurto's disciplinary proceeding, during that time frame no officers received the penalty of dismissal for misconduct solely relating to racially-offensive speech or expression; the only terminations were in cases involving officers with extensive prior disciplinary records. Plaintiff Locurto's termination in this case therefore was not consistent with the NYPD's ordinary disciplinary procedure. This is especially so when considered in light of the relatively lenient penalties given to officers who engaged in patently racist speech that, particularly when it occurred on duty, stood to produce many of the negative effects defendants contend they were concerned with in this case, such as interdepartmen-

tal friction, diminished civilian confidence and future legal liability.[16]

Defendants' stated concerns over disruption in this case are also inconsistent with the subsequent handling of the citywide and departmental disruption and public outcry surrounding the 1999 shooting death of Amadou Diallo. On February 4, 1999, Diallo, an unarmed West African immigrant with no criminal record, was shot and killed by four (4) undercover white members of the NYPD's Special Crimes Unit outside his South Bronx apartment building. *See* Pl. Locurto's Ex. 12. Mistaking Diallo for a wanted rapist, the officers fired 41 shots, hitting Diallo 19 times. *See id.* A substantial public controversy arose following the incident, with minority and community leaders alleging racial profiling and racism on the part of the NYPD. *See id.* For months, numerous demonstrations took place within and without the city.[17] *See id.* Following pressure from

---

**16.** For example, in 1992, while *on-duty*, an officer was charged with making the following remarks to several fellow members of the service assigned to the 75th precinct: "If you get it wrong, I will take you out and hang you from a tree"; and "All right, it's time for you to get to the back of the bus." The officer also was charged with using the term "nigger," referring to a prisoner as a "black piece of shit," and making inappropriate sexual remarks. Despite the workplace disruption to the 75th precinct that could be expected to follow from such on-duty remarks and the fact that the officer was previously disciplined, resulting in a loss of ten (10) vacation days, in finding the officer guilty, the Deputy Commissioner recommended a penalty of only twenty (20) days suspension without pay and disciplinary probation of one (1) year. Determining that a stronger penalty was in order, the then-Police Commissioner amended the penalty, adding a loss of thirty (30) vacation days. In another on-duty case from 1991, an officer was found guilty of stating to his partner in the presence of two (2) civilians, "Oh, it's just another nigger stabbed." Notwithstanding the potential impact on community relations, he lost just ten (10) vacation

days. In 1994, an *off-duty* officer was found guilty of shouting to a civilian in the course of a traffic dispute, "You fucking spic, keep going or I'm going to put six bullets in your head." The Commissioner adopted the recommendation of twenty (20) days suspension without pay, benefits or service time. *See* Pl. Locurto's Post–Tr. Proposed Findings of Fact, Ex. A.

**17.** On February 7, 1999, in the first of a growing series of protests, hundreds of people turned out for a rally outside Diallo's building. Five (5) days later, two (2) thousand people attended a memorial service for Diallo, whose parents had flown to New York to claim their son's body and bring it back to Guinea for a funeral. On February 15, activists in Washington D.C. rallied in protest of the shooting. The following month, daily protests began outside One Police Plaza in Manhattan; former Mayor David Dinkins was the first of over 1,000 people, including many city and statewide politicians, celebrities and business executives, to be arrested for demonstrating. Around that same time, civil rights leaders demanded a White House summit on police brutality. On April 15, 1999, thou-

outraged community leaders, various federal and state investigations were initiated, as well as private legal actions.[18] *See id.* The incident even evoked scathing public remarks concerning the Mayor and NYPD from the governor and a former Police Commissioner. *See id.* (Michael Cooper, *More Tolerance Needed By Mayor Pataki Suggests,* N.Y. Times, March 22, 1999, at A1 ("There is a legitimate fear among, particularly, minority groups, that the police can from time to time be too quick to take violent action."); *Police Head Defends His Force as Protests in Diallo Case Go On,* N.Y. Times, March 23, 1999, at A1 (quoting former Commissioner Bratton as saying: "The Mayor is going to have to understand that these demonstrations are reflections of a deep-rooted feeling, particularly in the minority community, that something is not working . . . as it relates to police and community relations.")).

On March 31, 1999, hundreds protested at the State Supreme Court in the Bronx, both for and against the officers, as the four (4) Street Crimes Unit officers were indicted by a grand jury on charges of second-degree murder and reckless endangerment. *See id.* On February 5, 2000, all four (4) officers were acquitted, sparking outrage and further protests throughout certain communities in the city. *See id.* Subsequent NYPD investigative panels recommended that the four (4) officers undergo retraining in firearm use, but that no further discipline was necessary, *see*

Donna De La Cruz, *Cops Won't Punish Diallo's Killers,* Associated Press, Apr. 28, 2001; full NYPD disciplinary hearings of the kind involved in this case never took place. The then-Police Commissioner agreed with the panels' recommendation regarding discipline but concluded that instead of retraining, he would place the officers on nonenforcement duty, preventing them from carrying guns and badges until such time as the Commissioner determined they were "fit for regular duty." *See id.*

Despite the negative criticism and charges of racism leveled against the NYPD throughout the city and nation, the obvious disruption the Diallo incident was causing within the city, particularly in minority communities, and the Commissioner's own recognition that the officers were not immediately "fit for regular duty," the Mayor and the Commissioner fully supported the reinstatement of the four (4) officers. In so doing, the Mayor also disregarded the concerns of Commissioner Von Essen who objected to the transferring of one (1) of the four (4) officers to the FDNY. *See* Pl. Locurto's Ex. 15, Deposition of Comm'r. Von Essen at 118–22. Unlike this case, where plaintiffs Steiner and Walters' fellow firefighters welcomed their return, Von Essen had told the Mayor pointedly that permitting the transfer would create significant disruption amongst the firefighters in the department. *See id.* The eventual transfer did,

---

sands marched across the Brooklyn Bridge to draw attention to Diallo's death and police brutality nationwide. In the aftermath of the shooting, polls confirmed that less than a quarter of all New Yorkers and only nine percent (9%) of blacks believed that the police treat blacks and whites evenly. *See* Pl. Locurto's Ex. 12.

**18.** For example, the United States Attorney for the Southern District of New York agreed to track the Bronx District Attorney's investi-

gation into the shooting. The United States Justice Department and the New York Attorney General announced that they would launch investigations into the Street Crime Unit's practices. The latter investigation subsequently produced a report concluding that substantial racial profiling was in fact taking place. Additionally, civil rights and minority groups filed a class-action lawsuit seeking to shut down the allegedly overly-aggressive Street Crimes Unit. *See id.*

in fact, cause immediate and angry responses from black firefighters, public officials and minority community representatives. *See* Verena Dobnick, *Firefighter Applicant Stirs Ire,* Associated Press, Apr. 15, 2001. These actions therefore were not in accord with their purported concerns in this case over inter-departmental friction, diminished civilian confidence and future legal liability.

Based on defendants' testimony and the timing and substance of the Mayor's public statements, as well as the evidence adduced on disciplinary custom, the Court finds that defendants terminated plaintiffs in response to the content of their speech and for reasons of public perception and the political impact expected to flow therefrom.

Finally, the Court finds that even if defendants made no decision to terminate plaintiffs until after the conclusion of their respective disciplinary hearings, the terminations were nonetheless in response to the content of plaintiffs' speech, not a concern for disruption. In the case of plaintiff Locurto, the NYPD's hearing adduced virtually no evidence on the issue of disruption. Regarding plaintiffs Steiner and Walters, as already discussed, defendant Von Essen's own testimony and autobiography lead the Court to find, as a matter of fact, that his underlying motivation in terminating plaintiffs was not disruption;

it was a calculated response based on political concerns.

## 2. Whether Concern for Disruption was Reasonable at Time of Decision

 Even if defendants did terminate plaintiffs out of a concern for potential disruption, this concern must nonetheless have been reasonable at the time the termination decision was made. Although substantial weight is given to the government employer's predictions of disruption, even when the speech involved is on a matter of public concern, such predictions must be reasonable. *See Waters,* 511 U.S. at 673, 114 S.Ct. 1878. To satisfy this burden, the government need only show potential interference, not actual disruption. *See id.* at 673, 114 S.Ct. 1878; *Jeffries,* 52 F.3d at 13. However, as the Second Circuit has cautioned, because "[t]here is . . . a proportion between the nature of the speech and the nature of the sanction," when a government employee addresses a matter of public concern, "the government's burden is to make a *substantial showing* of likely interference." *Jeffries,* 52 F.3d at 13 (citing *Waters,* 511 U.S. at 673, 114 S.Ct. 1878) (emphasis added). Under certain circumstances, this showing may include evidence that an investigation was conducted prior to deciding to take action against an employee. *See, e.g., Waters,* 511 U.S. at 677–78, 114 S.Ct. 1878.[19]

**19.** Plaintiffs suggest that the cases mandate that a government employer must conduct an investigation into the validity of its predictions of disruption in order for those predictions to be considered "reasonable." Plaintiffs, however, overstate the import of the relevant cases, which were limited to investigations focused on factual uncertainties. In *Waters,* the investigation deemed required under the law was concerned with resolving a dispute over *what* the employee said, not what its potential effect would be. 511 U.S. at 679–80, 114 S.Ct. 1878. Similarly inapposite is *Heil v. Santoro,* in which the govern-

ment investigated how the employee came into contact with and disseminated a document not addressed to him and classified as confidential. 147 F.3d at 109. No court, to date, has held that a government employer must conduct an investigation into the disruptive effects of an employee's speech; indeed, such a rule would be inconsistent with the reasoning behind the Supreme Court's deference to government employers and its unwillingness to require that employer decision-making procedures comport with the sort of evidentiary rules used by courts. *See Waters,* 511 U.S. at 673, 675–78, 114 S.Ct. 1878.

■ The Court finds, as a matter of fact, that defendants cannot carry their burden of making a "substantial showing" that their prediction regarding the likelihood of plaintiffs' speech to cause disruption was reasonable as of September 10, 1998. No credible evidence was adduced at trial to show that as of September 10, the Mayor and/or Commissioners had any, let alone sufficient, information regarding community reaction or potential effects on minority recruitment such that any prediction of disruption was reasonable. The Mayor acknowledged having not spoken with any representative of the minority community prior to September 10, 1998. *See* Tr. 230–36. To the contrary, the Mayor's own testimony at trial evinced the belief that evidence of potential disruption would not be necessary to sustain plaintiffs' termination; disruption could be assumed based only on the content of plaintiffs' speech.[20] The Court asked the Mayor whether he would agree that if no evidence concerning potential disruption was contained in the transcript of the NYPD's disciplinary hearing, there would be no basis upon which to fire plaintiff Locurto. The Mayor responded: "No, I wouldn't agree with that." Tr. 246. As noted above, Commissioner Safir similarly testified that he did not consider such evidence relevant. *See* Tr. 449, 450–52. Finally, because defendants did not know the specific identities of any police officers

or firefighters who participated in the Broad Channel float, the decision to terminate plaintiffs was made without any consideration of plaintiffs' past performance records or involvement with the communities within which they were assigned, factors seemingly relevant to determining interdepartment and community disruption. Tr. 239.

■ Although cognizant of the deference that must be given to government employer decisions, especially in situations involving police and fire forces, *see, e.g., Janusaitis v. Middlebury Volunteer Fire Dep't,* 607 F.2d 17, 26 (2d Cir.1979), the Court concludes that defendants have not produced sufficient credible testimony or other evidence to support a finding of reasonableness in regards to their prediction of disruption. The Court appreciates the controversial and troublesome nature of the speech in question. But *Water's* insistence on a "substantial showing"–and the requirement that the prediction of disruption be reasonable in the first instance– requires more from the government than the mere identification of the potentially controversial content of given speech and conclusory opinions related thereto. *See Waters,* 511 U.S. at 674, 114 S.Ct. 1878; *Pickering,* 391 U.S. at 571, 88 S.Ct. 1731; *see also Connick,* 461 U.S. at 152, 103 S.Ct. 1684. *Waters* reminds us that although the same sorts of evidentiary standards

Of course, to say that an investigation into the validity of the government's predictions of disruption is not legally required in all cases does not prevent the Court from drawing an inference against defendants when considering the question of whether they were, in fact, motivated by a reasonable concern for disruption, based on their lack of inquiry into such issues as plaintiffs' past performance and minority community reaction.

20. Responding to a question from the Court regarding impact on community relations, the following colloquy took place:

Q: Did you contemplate an assessment of the community impact as part of the investigation?
A: I don't know that I did ... I thought it was more specifically directed to what they did, who did it, and what they said.
Q: A general assumption of community impact if the facts were established?
A: I thought that was a pretty simple conclusion.
Tr. 322.

utilized by courts do not bind government employers' decision-making, their decisions cannot be arbitrary. *See Waters,* 511 U.S. at 677, 114 S.Ct. 1878. If the record in this case was sufficient to satisfy *Waters,* then the patently offensive nature of a police officer's or firefighter's off-duty speech, coupled with mere speculation, would be enough to establish a reasonable concern for disruption. Deference to defendants' "special expertise" and/or concern for efficient decision-making cannot justify a conclusion based on no evidence or sheer speculation. *See Waters,* 511 U.S. at 677, 114 S.Ct. 1878.

Even if the Court also considers the evidence offered after September 10, 1998, including that introduced at plaintiffs' administrative hearings, the Court nonetheless concludes that defendants failed to make a substantial showing that their prediction of disruption was likely. With respect to plaintiff Locurto, the Court finds that the administrative record lacks any credible evidence of workplace disruption aside from the conclusory statement of Dr. James O'Keefe, Director of Training, who stated generally that racial prejudice "can be disruptive to the workforce," and Deputy Commissioner Koshetz's relied upon assumption that "[a] police officer's participation in this racially inflammatory behavior can not help but endanger working relationships." *See* Fogel Draft from Deputy Commissioner Koshetz (Fogel Draft) at 14. Further, Koshetz's Fogel Draft frames Reverend Al Sharpton's testimony about a rally he led on September 12, 1998 as evidence of "a public outcry" and thus disruptive to the functioning of the NYPD. *See* Fogel Draft at 14–15. The Court finds that this does not accurately represent Mr. Sharpton's testimony. Called to testify by plaintiff Locurto, Mr. Sharpton stated that the rally of approximately 150 people intended to "focus attention on the continual racial problems of the city" and express their lack of amusement with the sort of parodies that many in the Broad Channel community found funny. *See* Defs.' Ex. F at 232. According to Mr. Sharpton, those at the rally were also concerned that the Mayor was avoiding the important issues of NYPD misconduct and brutality, including those surrounding the Million Youth March controversy, and that he was instead choosing to scapegoat plaintiffs for the comparatively lesser offense of calling people "racial names." *See id.* at 237–39. The rally did not picket the Broad Channel or any other police station, nor did it focus on the specific plaintiffs in this case. *See id.* at 233. A peaceful demonstration held in response to the expression of certain viewpoints in a community and focusing on the issue of police department policy cannot constitute a substantial showing of likely disruption to the NYPD.

The FDNY hearing adduced only slightly more evidence. As for workplace disruption, however, after balancing the weight of the evidence, and particularly in light of the multitude of fellow firefighters who, even if offended by the float's content, testified that they would welcome back plaintiffs Steiner and Walters and foresaw no disruption, the Court finds defendants' showing insufficient. With respect to the external issues of community relations and minority recruitment, the Court finds, *inter alia,* that the testimony of Commissioner Feehan at the OATH hearing, and of former-Lieutenant Wright and former-Deputy Commissioner Tierney before this Court, was based primarily on personal opinion and anecdotal evidence and, therefore, insufficient to constitute a reasonable fear of disruption. *See* Defs.' Ex. K at 169–98; Tr. at 492–566.

However, assuming *arguendo* that the testimony offered on potential external disruption is sufficient as a factual matter for

defendants to carry their burden, as discussed below, the Court concludes that such disruption, which is solely external and based on feared community reaction to plaintiffs' speech, is insufficient, as a matter of law, to outweigh plaintiffs' interest in engaging in controversial, off-duty speech unrelated to the workplace and regarding a matter of public concern.

### 3. *Balance of Interests*

 Where a government employer takes adverse action against a government employee based on a genuine and reasonable concern for potential disruption resulting from the employee's speech, to be constitutionally permissible, the Court must conclude further, as a matter of law, that the potential disruptiveness is sufficient to outweigh the employee's interest in expressing himself on the particular matter of public concern. *See Jeffries*, 52 F.3d at 12, 13 (citing *Waters*, 511 U.S. at 668, 114 S.Ct. 1878). The Supreme Court has recognized as pertinent considerations "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. Other circuit courts have found relevant as well the time, place and manner of the speech, the context in which the underlying dispute arose, the degree of public interest in the speech, and whether the circumstances require that the speaker be regarded as a member of the general public. *See, e.g., Greer v. Amesqua*, 212 F.3d 358 (7th Cir. 2000), *reh'g and reh'g en banc denied*, (June 21, 2000), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 568, 148 L.Ed.2d 487 (2000). After considering the relevant factors, the Court concludes that defendants have failed to demonstrate a governmental interest that outweighs plaintiffs' First Amendment rights.

The Court notes first that defendants' concerns do not focus on *internal* disruption. The record is devoid of evidence of actual or potential disruption to the NYPD's or FDNY's internal operations as a result of plaintiffs' speech–no disciplinary problems, no disharmony, no impact on working relationships and no performance problems on the part of plaintiffs. To the contrary, despite being identified by fellow officers and firemen, all three (3) plaintiffs performed their shifts without incident for the four (4) days prior to their suspension. Furthermore, at their OATH hearing, plaintiffs Steiner and Walters produced unrebutted testimony of numerous firefighters–including that of one (1) African-American–that, though in some cases offended by the float, they would gladly welcome both plaintiffs back and envisioned no negative impact on department harmony, morale or effectiveness by so doing. Their prediction is supported by the lack of any disharmony or tensions caused by plaintiffs' participation in past years' floats, many of which were potentially offensive to particular ethnic or religious groups.

As a result of the lack of evidence of internal disruption, defendants' case relies on evidence of the potential disruption to the departments' *external* operations–specifically, community relations and minority recruiting. This evidence, moreover, focuses solely on an anticipated reaction to the speech by certain offended groups within the city. In support of their contention that such potential external disruption is alone sufficient to outweigh plaintiffs' free speech interests, defendants rely on the Second Circuit's decision in *Pappas*

*v. Giuliani.*[21]

Defendants claim that *Pappas* established a rule whereby any speech that the NYPD deems potentially offensive to a certain minority segment of the population is *per se* disruptive, and that such disruption is sufficient to outweigh the First Amendment value of the particular police officer's speech. Defendants cite the following passage from *Pappas* in support of their point:

> If the police department treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt, so that the particular minority comes to regard the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired. Members of the community will be less

likely to report crimes, to offer testimony as witnesses, and to rely on the police for their protection. When the police make arrests in that community, its members are likely to assume that the arrests are a product of bias, rather than well-founded, protective law enforcement. And the department's ability to recruit and train personnel from that community will be damaged.

290 F.3d at 146–47 (citing David Cole, *No Equal Justice* 169–78 (1999); Brandon Garrett, Note, *Standing While Black: Distinguishing Lyons in Racial Profiling Cases*, 100 Colum. L.Rev. 1815, 1833 nn. 72, 73 (2000); C.J. Chivers, *Alienation is a Partner for Black Officers Feeling Scorn on the Beat and Pressure from Above*, N.Y. Times, Dec. 26, 2000, at A1).

■ As discussed above, the district court held that Pappas' sending of racist

---

**21.** Contrary to defendants' contention, this case is distinguishable from *Waters,* where the Court found that "[d]iscouraging people from coming to work for a department" and "threaten[ing] to undermine management's authority," qualified as disruption sufficient to outweigh the value of plaintiff's speech. 511 U.S. at 680–81, 114 S.Ct. 1878. In that case, plaintiff, an on-duty employee, directed negative comments to another on-duty employee about her employer and his practices. The sole intent and only logical import of plaintiff's remarks were to discourage the other employee from transferring departments. In this case, however, plaintiffs' remarks were neither on-duty, nor aimed specifically at fire or police department policies, current personnel, or future recruits. Any resulting discouragement on the part of would-be minority recruits based on plaintiffs' speech, therefore, would have required an outside individual to interpret plaintiffs' speech in a particular, personal way. Further, as noted, in reaching its conclusion, the Court in *Waters* also found that defendants offered strong evidence that plaintiff's behavior could negatively affect management's functioning. *See id.*

Defendants' reliance on *Tindle v. Caudell,* 56 F.3d 966 (8th Cir.1995), is similarly mis-

placed. In *Tindle,* an off-duty police officer attended an unofficial police department function hosted by the Fraternal Order of Police dressed in blackface, wearing a curly wig and carrying a watermelon. 56 F.3d at 968. Aside from the superficial similarities of the officer's costume, however, the facts of *Tindle* are completely inapposite. Most significantly, although it went on to conduct the *Pickering* balance test, the Eighth Circuit initially concluded that plaintiff's speech was devoid of any intended message and thus not entitled to First Amendment protection. *Id.* at 969–71. Distinguishing it from other cases that had appropriately garnered protection, the court noted that the speech at issue did not involve public expression or any sort of "theatrical performance" or "costume contest," nor did it make any attempt at satire or parody. *Id.* at 969–70. Further, unlike here, the police department in *Tindle* was concerned exclusively with disruption and disharmony *within the department;* indeed, numerous African–American police officers had resigned from the Fraternal Order of Police or had otherwise expressed the offense they took to plaintiff's costume. *Id.* at 968. Finally, the penalty imposed in *Tindle* was thirty (30) days suspension without pay, far less severe than full termination. *Id.* at 968.

propaganda because "[he] was tired of being shaken down for money" constituted a matter of purely private concern. The Second Circuit, however, declined to affirm on that ground, opting instead to address *Pickering's* balance test. Because the Court has concluded above that the speech at issue in this case is of far greater public concern than the private speech involved in *Pappas*, the Court now concludes that plaintiffs' attendant interest in expressing themselves on such a matter must be considered more heavily, as well. *See Connick*, 461 U.S. at 152, 103 S.Ct. 1684 ("[A] stronger showing may be necessary if the employee's speech more substantially involved matters of public concern."). Therefore, given the fact sensitive context of First Amendment decisions, the Court concludes that *Pappas* does not, on these facts, require dismissal of plaintiffs' claims.

■■■ However, to the extent *Pappas* indeed stands for the rule that feared public reaction to controversial expressive activity unrelated to work or the workplace is sufficient in itself to outweigh the First Amendment interests of persons employed by the government, or at least police officers, to engage in such expressive activity, the Court believes that such a rule goes far beyond the principles set forth in *Pickering* and thus would violate the First Amendment. *See Pickering*, 391 U.S. at 574, 88 S.Ct. 1731 ("[I]n a case [where] the fact of employment is only tangentially and insubstantially involved in the subject matter of the communication made by [an employee], we conclude that it is necessary to regard the [employee] as the member of the general public he seeks to be."); *see*

also *Bonds*, 207 F.3d at 976. Indeed, such a rule would render meaningless *Pickering* and its progeny, as well as the Second Circuit's own precedents.

■■■ The only relevant question would become whether an officer's speech, even if off-duty, was sufficiently offensive to the public. Such a limited inquiry could perilously open the door to infringement upon other core, constitutionally-protected activities that an officer may engage in while off-duty, such as attending religious functions or other meetings to which certain members of the public object. *See Flanagan v. Munger*, 890 F.2d 1557, 1567 (10th Cir.1989) ("There are strong First Amendment values in the free exercise of religion and in freedom of assembly which could be severely restricted if external objectors' justifications were allowed to be applied in these cases."). Moreover, because *Pappas'*s conclusions rely primarily on personal observation, social science literature, law review notes and newspaper articles–most of which would be inadmissible at trial–the answer to whether the challenged speech was "sufficiently offensive" could be supplied, presumably, through no more than employer speculation. *See Pappas*, 290 F.3d at 146–47, 149–50. As noted above, the Supreme Court's decisions require more. *See, e.g., Waters*, 511 U.S. at 677, 114 S.Ct. 1878; *Connick*, 461 U.S. at 152, 103 S.Ct. 1684; *see also Tinker*, 393 U.S. at 508, 89 S.Ct. 733 ("[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.").[22]

---

**22.** Nor can the size of the audience or the scope of an offensive message's circulation, by itself, outweigh an employee's right to free speech. To the contrary, as discussed above, *Pickering's* threshold question of whether speech addresses a matter of public concern involves an inquiry into the form and context of the employee's speech, which may include whether the speaker chose a public or private forum. *See Connick*, 461 U.S. at 148, 103 S.Ct. 1684. Although speech need not be public to address a matter of public concern, *see Givhan*, 439 U.S. at 414–15, 99 S.Ct. 693, the fact that speech was aimed at, and heard

■ Furthermore, allowing speculative or conclusory statements regarding potential community reaction to constitute a legally sufficient governmental interest is, in essence, allowing a "heckler's veto" to quash unpopular speech, a notion long rejected by the Supreme Court. *See, e.g., Cox v. State of Louisiana,* 379 U.S. 536, 537–44, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *Edwards v. South Carolina,* 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); *Terminiello v. City of Chicago,* 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). In fact, the government's interest in this case is more attenuated than those previously rejected by the Supreme Court when addressing the constitutional infirmities inherent in the heckler's veto. In those cases, the Court often was called on to consider, through hindsight, the constitutionality of applying certain public obstruction or disturbance statutes to speech in a factual and historical context in which disturbance and hostility was a more proximate danger. *See, e.g., Terminiello,* 337 U.S. at 2–3, 69 S.Ct. 894. Here, by contrast, any "community veto" would be based entirely on speculative fears. *Accord Flanagan,* 890 F.2d at 1566 ("The [police] department cannot justify disciplinary action against plaintiffs simply because some members of the public find plaintiff's speech offensive and for that reason may not cooperate with law enforcement officers in the future."); *Berger,* 779 F.2d at 1001 ("Here not only was the perceived threat of disruption [to the police department] only to external operations and relationships, it was caused not by the speech itself but by threatened

reaction to it by offended segments of the public.... [W]e think this sort of threatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech.").

■ This conclusion is further supported by cases such as *Cox v. Louisiana,* where the Supreme Court upheld the free-speech rights of a black student who led a demonstration against segregation, notwithstanding the state's allegations of public hostility and the fact that, at the time, many in the community viewed the protesters' position as objectionable and offensive. *See* 379 U.S. at 552, 85 S.Ct. 453. Although the viewpoint expressed here questioned the desirability of residential integration, the underlying constitutional principles that guided the Court in that case are the same. In sum, the government may not prohibit the expression of an idea simply because a segment of society finds it offensive. *See Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (citations omitted). On the contrary, "a function of free speech ... is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest ... or even stirs people to anger.... It may strike at prejudices and preconceptions and have profound unsettling effects[.]" *Cox,* 379 U.S. at 551–52, 85 S.Ct. 453 (quoting *Terminiello,* 337 U.S. at 4–5, 69 S.Ct. 894). To say on the one hand that policemen (and firemen) retain significant First Amendment rights notwithstanding their government service, while on the other hand effectively depriv-

by, the broader public can serve as evidence that it addressed a matter of public concern, not just a private grievance. *See e.g., Kurtz v. Vickrey,* 855 F.2d 723 (11th Cir.1998); *Terrell v. Univ. of Texas Sys. Police,* 792 F.2d 1360, 1362–63 (5th Cir.1986); *Pappas,* 118 F.Supp.2d at 445–46. Far from permitting

the scope of a government employee's speech to negatively effect his rights under *Pickering,* communication to a large audience, under certain circumstances, entitles a government employee to *enhanced* First Amendment protection.

ing them of that right's "high purpose," is to guarantee a most empty protection indeed.[23]

## CONCLUSION

For the reasons set forth above, the Court finds in favor of plaintiffs, holding that defendants are liable under § 1983 for impermissibly terminating plaintiffs in violation of their constitutional rights to free speech.

It is **SO ORDERED**.

23. Because the Court concludes that defendants acted for reasons other than a reasonable concern for disruption in terminating plaintiffs, the Court need not address defendants' claims of qualified immunity. *See Locurto*, 264 F.3d at 169–70. Furthermore, because the Court has resolved the federal claim, it declines to exercise jurisdiction over plaintiffs' state claim under Article 78.