SEYMOUR, J.,
concurring in part and dissenting in part.
This is an unusual case, involving as it does an across-the-board ex ante ban on a public employee’s right to speak in his native language while at work. While I join fully in the well reasoned opinion insofar as it reverses the district court’s grant of summary judgment to the City on Plaintiffs’ discrimination and equal protection claims, I am unable to endorse the majority’s decision to affirm the district court with respect to Plaintiffs’ First Amendment claim. Because I believe that the majority’s application of the four-part Mt. Healthy test for retaliation is incorrect, and Plaintiffs’ proposed speech involves a matter of public concern, I would reverse the district court’s decision to the contrary and remand for further proceedings.
As the Supreme Court established in Pickering v. Bd. of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), a governmental entity
may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large. When a court is required to determine the validity of such a restraint, it must arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.
United States v. Nat’l Treasury Employee’s Union, 513 U.S. 454, 465-66, 115 S.Ct. *1317 1003, 130 L.Ed.2d 964 (1995) (citations and quotations omitted). Unlike Pickering, National Treasury was not a case involving a First Amendment retaliation claim in which a government employer allegedly took adverse employment action against its employee for a specific speech incident. Rather, it was a prior restraint case in which the plaintiffs were employees of the executive branch of the federal government challenging on First Amendment grounds a 1989 act of Congress prohibiting them from receiving compensation for appearing, speaking or publishing articles outside of work on subjects unrelated to their employment. Id. at 457-460, 115 S.Ct. 1003. In that context, the Court did not consider the motivation of the government, i.e., whether by enacting the ban on compensation it intended to curtail protected speech. Instead, the Court focused only on whether the speech at issue touched on a matter of public concern, and whether on balance the government employer’s stated goals in prohibiting federal employees from receiving compensation for their speech activities outweighed the plaintiffs’ and future employees’ interests in speaking as citizens on matters of public concern. Id. at 468, 115 S.Ct. 1003.
As in National Treasury, Plaintiffs contend the government, here the City of Altus, has imposed a prior restraint on speech. They claim the City’s ex ante rule against speaking Spanish violates their First Amendment rights by chilling their speech before it occurs, not by punishing it after it has already taken place. The majority is wrong, therefore, to state as it does that in this case we apply a four-part test “[t]o determine whether a public employer has infringed the First Amendment free-speech rights of an employee.” Maj. op. at 1309.[1] That test was established by the Supreme Court in Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a retaliation case. There, the Court first reiterated that
whether speech of a government employee is constitutionally protected expression necessarily entails striking a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.
Id. at 284, 97 S.Ct. 568 (emphasis added, citations and quotations omitted). It is *1318 clear, therefore, that speech of a public employee is constitutionally protected if it meets the first two prongs of the Pickering test. It is only when the employee seeks to undo or receive damages for an adverse employment action that he must establish not only “that his conduct was constitutionally protected, [but also] that this conduct was a ‘substantial factor’ or to put it in other words, that it was a ‘motivating factor’ in the” government employer’s adverse action against him. Id. at 287, 97 S.Ct. 568 (emphasis added). The latter requirement is the third prong of the four-part test which the Court developed in Mt. Healthy to analyze retaliation claims where a plaintiff has suffered an adverse employment action and seeks to show that the action came as a result of engaging in protected speech.
This case presents no such claim. Plaintiffs in the present case do not claim that they have been reprimanded, see Belcher v. City of McAlester, 324 F.3d 1203, 1205 (10th Cir.2003), terminated, see Schalk v. Gallemore, 906 F.2d 491, 493 (10th Cir. 1990), suspended, see Gardetto v. Mason, 100 F.3d 803, 810 (10th Cir.1996), or anything else. Instead they claim that the English-only rule constitutes prior restraint on speech. Therefore, we should apply the two-part test set forth in United States v. Nat’l Treasury Employee’s Union, 513 U.S. at 465-66, 115 S.Ct. 1003, namely, (1) whether Plaintiffs’ decision to speak Spanish touches on a matter of public concern, and (2) whether the City’s interest in regulating Plaintiffs’ use of Spanish outweighed the Plaintiffs’ interest in speaking Spanish.[2] See Milwaukee Police Ass’n v. Jones, 192 F.3d 742, 749-50 (7th Cir.1999) (applying hybrid Pickering / National Treasury test to government employees’ First Amendment challenge to ex ante regulations without requiring plaintiff to establish motivation of the government); Harman v. City of New York, 140 F.3d 111, 117-18 (2d Cir.1998) (same); Weaver v. United States Info. Agency, 87 F.3d 1429, 1439-40 (D.C.Cir.1996) (same).
I also part company with the majority in determining whether Plaintiffs’ speech touched on a matter of public concern. The majority states that Plaintiffs have not pointed to any specific statements or types of statements they consider to be of public concern. I disagree with this characterization of the record. While it is true that Plaintiffs’ complaint does not specifically allege that their banned speech is of public concern, both Plaintiffs and the City fully addressed the public concern issue in their summary judgment briefs. Moreover, in its opinion, the district court recognized that Plaintiffs had characterized the “content” of their speech as ethnic pride. Aplt. App., vol. Ill at 897. Having so recognized, the court then held that “Plaintiffs have not shown that their pride in their Hispanic heritage ... is a matter of concern to the general public so as to merit First Amendment protection.” Id. It is therefore reasonable to assume that the alleged “content” of Plaintiffs’ speech, namely, their choice to converse in Spanish *1319 rather than English, is pride in their cultural and ethnic identity and heritage. Plaintiffs have thus indicated that their desire to speak Spanish is, itself, a matter of public concern.
In arguing that their choice of language is itself a statement of public concern, Plaintiffs find support in Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), an opinion addressing a criminal defendant’s challenge to the prosecutor’s explanation for striking two Hispanics from a pool of prospective jurors. In Hernandez, the prosecutor’s stated reason for striking the jurors was that they were bilingual and the prosecutor was not certain they would accept a translator’s statement of the witnesses’ testimony. Id. at 356, 111 S.Ct. 1859. In holding that the prosecutor’s explanation was race-neutral, the Court recognized the power of language (as well as a person’s decision to speak a particular language as opposed to another) to convey special meaning as well as to engender conflict and disclose bigotry. The Court wrote:
Language permits an individual to express both a personal identity and membership in a community, and those who share a common language may interact in ways more intimate than those without this bond. Bilinguals, in a sense, inhabit two communities, and serve to bring them closer.
Just as a shared language can serve to foster community, language differences can be a source of division. Language elicits a response from others, ranging from admiration and respect, to distance and alienation, to ridicule and scorn. Reactions of the latter type all too often result from or initiate racial hostility.
Id. at 370-71, 111 S.Ct. 1859 (plurality opinion). The Ninth Circuit expressed a similar understanding of the important connection between language and ethnic identity in Garcia v. Spun Steak Co., 998 F.2d 1480 (9th Cir.1993), when it said, “[i]t cannot be gainsaid that an individual’s primary language can be an important link to his ethnic culture and identity.” Id. at 1487.
While these two opinions did not address First Amendment issues, they provide support for the proposition that a person’s choice of language can convey a message — and a powerful one at that. They also support the proposition that language choice and ethnic or cultural identity can be inextricably intertwined both in the mind of the speaker and in the minds of those who hear him. As the Court recognized in Hernandez, that linkage between language and ethnic identity can elicit not only a sense of familiarity or solidarity, but discomfort or even hostility, from a speaker’s audience.
Plaintiffs cite Latino Officers Ass’n, New York City, Inc. v. City of New York, 196 F.3d 458, 466 (2d Cir.1999), for the proposition that a group’s “interest in communicating ethnic pride,” whether through choice of language or by marching in a parade as the plaintiffs in Latino Officers Ass’n did, may be a matter of public concern. Whether a statement or other form of speech by a public employee communicating ethnic pride is a matter of public concern requires us to assess “the content, form, and context” of the given statement or form of speech, “as revealed by the whole record.” Connick v. Myers, 461 U.S. 138, 147-48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In determining whether speech “touches on a matter of public concern,” a court should ascertain “whether it can be fairly considered as relating to any matter of political, social, or other concern to the community.” Hardeman v. City of Albuquerque, 377 F.3d 1106, 1113 (10th Cir.2004) (quoting Burns *1320 v. Bd. of County Comm’rs, 330 F.3d 1275, 1286 (10th Cir.2003)).
With these instructions in mind, I turn to the facts alleged by Plaintiffs in the present case. The district court found and the majority agrees that Plaintiffs identify the message of their proposed speech to be pride in their ethnic heritage. Plaintiffs analogize their use of Spanish to wearing tee-shirts to work proclaiming “proud to be Hispanic!” Aplt. Br. at 57. The district court held that Plaintiffs failed to show statements of ethnic pride akin to the wearing of a tee-shirt are matters of public concern requiring protection under the First Amendment. But Connick and its progeny instruct us that the form speech takes (here, choice of language) and the context in which it is spoken are just as important as content. Moreover, Connick instructs that context is revealed by the record as a whole.
Plaintiffs’ strongest characterization of their speech can be found in a letter written by Tommy Sanchez and co-signed by Rueben Rios and Lloyd Lopez. ApltApp., vol. II at 521-23. The letter is addressed to defendant city administrator, Michael Nettles, and copied to the City’s mayor and attorney. Writing on June 18, 2002, Mr. Sanchez informed Mr. Nettles that his subordinates, Mr. Rios and Mr. Lopez, were recently instructed by their supervisor, defendant Holmes Willis, that they were no longer permitted to speak Spanish while they are at work. Mr. Sanchez noted he had been previously unaware of any English-only rule for City employees and, therefore, decided to question Mr. Willis about it directly. This conversation, wrote Mr. Sanchez, first alerted him to the apparent intention of the City to adopt this new English-only policy and apply it citywide. When he asked Mr. Willis why such a policy was necessary, Mr. Willis told him Mr. Nettles believed that the use of Spanish by certain city employees “needed to stop” because “it was making others feel uncomfortable.” Id. at 521. Mr. Willis informed him that “the only reason that we (Hispanics) speak Spanish to each other is because it reflects our insecurities.” Id. Mr. Sanchez then wrote: “In my many years with the City of Altus, I have never seen a policy be issued to restrict hispanics [sic] from expressing our heritage by speaking our native language to each other, as this new policy now imposes.” Id. at 522 (emphasis added). Finally, Mr. Sanchez ended: “I prayfully [sic] request that the City of Altus understand that we Hispanics are proud of our heritage and do not feel that our ability to communicate in a bilingual manner is a hindrance.” Id. at 523. Significantly, Mr. Sanchez made clear that the purpose of the letter was to formally file a discrimination complaint against the city on the behalf of Mr. Rios and Mr. Lopez, objecting to the proposed English-only policy. Less than one month after Mr. Sanchez wrote the letter, the City summarily adopted the English-only requirement.
Before litigation challenging the legality of the City’s English-only policy ever commenced, therefore, in a plea for understanding and reconciliation, Mr. Sanchez himself characterized the content of the prohibited speech as an expression of community identity and ethnic heritage, of solidarity and pride, in the face of contravening forces. In other words, an apter analogy may be wearing a tee-shirt proclaiming “proud to be a Yankees fan” to a rally for the Boston Red Sox, because that analogy describes the context as well as the content of the speech.
With respect to context, the record contains evidence of months of tension between Hispanic and non-Hispanie City employees. Prior to the adoption of the English-only policy, several Hispanic *1321 employees had filed complaints of discrimination and retaliation. The City, in response, had hired an outside human resources consultant to investigate the complaints and the severity of the situation and report back to the City Council. The record thus establishes that numerous individuals, both Hispanic and non-Hispanic, were involved in an on-going and evolving discussion on race relations, and that all levels of City government were involved, including the mayor, the City administrator, the City’s director of human resources, and many City department heads and supervisors. The record further indicates the general public was aware of and interested in the English-only policy and its effects. Contained within the record are several news articles on the City’s English-only policy, for which public employees on both sides of the debate were interviewed. In one such article, the mayor was quoted as referring to the Spanish language as “garbage.” That he later claimed in his deposition to have been misquoted is irrelevant to the question of whether his misquote further inflamed public debate over the English-only policy and its perceived intent. Moreover, the mayor’s testimony that he eventually apologized to the City council for the misquote underscores the seriousness and the pervasiveness of the whole issue, namely, the apparently degenerating relations between Hispanics and non-Hispanics in the City of Altus. At a certain point then, this dispute evolved from a situation involving City employees to a wider discussion of discrimination, race relations, and the power of expressions of ethnic identity to elicit strong emotions on either side.
In sum, this is not a case about a single employee wearing a tee-shirt proclaiming “proud to be Hispanic!” or “proud to be Irish!” or “proud to be Vietnamese!” This is a case about a large group of employees (twenty-nine Hispanic City employees) desiring to wear such tee-shirts when an even larger number of their fellow employees are wearing (or perceived to be wearing) tee-shirts proclaiming “annoyed by Hispanics!” or “sick and tired of the Irish!” or “threatened by Vietnamese!” The record suggests this was a situation in which the right to speak one’s chosen language became an expression of pride and resistance and identity. In a City where a sizable number of citizens identifies strongly with one side or the other, it is nonsensical to conclude as the majority does that Plaintiffs’ use of Spanish would not be “uttered with an eye to action, to improve the public welfare,” but was instead meant only “to remedy a personal grievance.” Maj. op. at 30. Indeed, it is unclear to me why the fact that twenty-nine City employees share the same race-related grievance does not foreclose any characterization of this complaint as mere “personal concern.”
In addition to the specific facts alleged in this case strongly suggesting the existence of a broad City-wide discussion of ethnicity, identity, and discrimination, numerous courts have found that otherwise “personal” statements of ethnic, racial or religious identity or expressions of sexual orientation constitute speech touching on matters of public concern. In Altman v. Minn. Dep’t of Corr., 251 F.3d 1199 (8th Cir.2001), the court held that for the purposes of their First Amendment claim, Department of Corrections employees were speaking on matters of public concern when they silently read their Bibles during a mandatory training program entitled “Gays and Lesbians in the Workplace.” The court rejected the defendants’ argument that the employees did not engage in speech on a matter of public concern be *1322 cause their speech was “concerned only with internal policies or practices which are of relevance only to the employees of that institution.” Id. at 1202 (citations omitted). While agreeing with the defendants that the issue, namely, the appropriateness of the training program and its mandatory nature, was “inherently ‘internal,’ ” the court went on to state that “the way in which the Department [of Corrections] ... deal[s] with issues of gays and lesbians in the workplace affects the performance of [the Department’s] public duties and is a matter of political and social concern to the general public.” Id. The court pointed to the role played by the defendants in changing what otherwise may have been merely an internal matter into a matter of public concern by making the training program mandatory. In doing so, the court was persuaded the defendants “created a context in which employees speaking out in opposition to their public employer’s handling of this social issue should be considered speech on a matter of public interest and concern.” Id.
In my judgment, there are no meaningful grounds upon which to distinguish the facts in Altman from those in the present case. Like the public employees’ speech in Altman, namely, their reading of the Bible during a mandatory employment program, Plaintiffs’ speech, namely, their conversing in Spanish as opposed to English, conveys their strong identification with a particular viewpoint and position and their opposition to the City’s contrary policy. Like the way the Department of Corrections handles the issue of gays and lesbians in the workplace, the way in which the diverse City of Altus deals with the issue of cultural, ethnic and linguistic diversity in the workplace “is a matter of political and social concern to the general public.” Id. And just as the Department of Corrections in Altman, by making its program mandatory, created a context in which its employees’ Bible reading became speech on a matter of public concern rather than simply an internal grievance, the City, by virtue of adopting a mandatory English-only policy in the midst of complaints about discriminatory practices against Hispanics, rendered Plaintiffs’ use of Spanish at the workplace speech that touches on a matter of public concern.
In another analogous case, the court held that the employees’ speech touched on a matter of public concern because it occurred in the midst of the nation’s “long, continuing debate over the desirability of community racial integration in this country.” Locurto v. Giuliani, 269 F.Supp.2d 368, 386 (S.D.N.Y.2003). In Locurto, plaintiffs who were terminated from their jobs as New York City police officers and firemen argued that their appearance in a Labor Day parade on a float entitled “Black to the Future,” wearing black-face and engaging in various racially offensive pantomimes, was speech on a matter of public concern to the extent that it was a commentary on their community’s increasing racial integration. Id. at 385. While noting that the plaintiffs’ speech was distasteful and engendered considerable conflict, the court was clear that whether a speaker speaks on the side of the angels or the devils does not matter for the purpose of determining whether the speech touches on a matter of public concern. Id. at 386. Rather, the court said the determination must turn on how broad the context is in which the speech occurred, and how many people, beyond the plaintiffs themselves, are involved in or may be impacted by the broader discussion. Id. at 387-88. Similarly, in assessing the context surrounding Plaintiffs’ speech in the present case, we must consider the evidence of an on-going, wide-ranging debate over diversity, involv *1323 ing dozens of individuals and City policy makers.
Three additional public employee First Amendment opinions are instructive. Tucker v. Cal. Dep’t of Educ., 97 F.3d 1204 (9th Cir.1996), and Nichol v. Arin Intermediate Unit 28, 268 F.Supp.2d 536 (W.D.Pa.2003), both address claims by public employees that their government employers violated their First Amendment rights by enacting policies prohibiting certain forms of overtly religious expression. In both cases, the courts held that speech touching on deeply-felt religious identity constituted speech regarding a matter of public concern. Tucker, 97 F.3d at 1210 (challenging ban on religious speech and decorations in the workplace); Nichol, 268 F.Supp.2d at 557-60 (challenging ban on religious jewelry or ornamentation in the workplace). Similarly, both courts noted that while the plaintiffs’ religious identities and viewpoints were inherently personal, the fact that their identities and viewpoints were shared by a significant number of fellow citizens, both locally and nationally, rendered their expression of their identities and viewpoints, especially in the face of controversy and suppression, matters of public concern.
Another analogous case, Weaver v. Nebo Sch. Dist., 29 F.Supp.2d 1279 (D.Utah 1998), dealt with a school district’s order prohibiting the teacher plaintiff from identifying herself as a lesbian and discussing her homosexuality outside of the classroom. In rejecting the defendants’ argument that the plaintiff could not demonstrate her sexual orientation was a matter of public concern, the court noted that “[cjertain issues may be considered ‘inherently of public concern.’ ” Id. at 1284 (quoting Connick, 461 U.S. at 148, 103 S.Ct. 1684 n. 8). In support of including sexual orientation in the list of matters to be considered “inherently of public concern,” the court noted that “[sjeveral legal authorities have suggested that one’s identity as a homosexual — even though it is in essence a private matter — is inherently a matter of public concern because it necessarily and ineluctably involves that person in the ongoing public debate regarding the rights of homosexuals.” Id. (internal quotation marks omitted). Furthermore, as in Altman, the court in Weaver pointed to the defendants’ role in making the plaintiffs speech a matter of public concern. Id. The plaintiffs sexual orientation in Weaver was a topic of conjecture, rumor and indignation long before she ever spoke publically about being a lesbian, and the court noted that numerous government officials were involved in deciding what, if anything, should be done about the plaintiffs desire to identify herself as homosexual. Thus, “defendants’ actions converted this issue to a matter of public concern.” Id.
Just as the Tucker plaintiffs religious cubicle decorations and the Nichol plaintiffs gold cross constituted speech proclaiming their identities as Christians and their pride in that identity, Plaintiffs’ use of Spanish in the present case proclaims their identities as Hispanics and their pride in that identity. And just as the courts in Tucker, Nichol and Weaver found that the plaintiffs’ controversial identities “necessarily and ineluctably” involved them in the ongoing public debates regarding the separation of church and state, religious rights, and the rights of homosexuals, Plaintiffs’ identities as Hispanic (made “controversial” by the allegedly racially-charged atmosphere in the City of Altus) involved them in the ongoing public debate over diversity in America and linguistic integration. Moreover, just as the courts in Tucker, Nichol and Weaver held that debate over those plaintiffs’ identities rendered their speech a matter of public concern, the ongoing public debate over *1324 Plaintiffs’ use of Spanish to convey pride in their identities makes their expressions of that identity a matter of public concern.
Significantly, the majority itself, me included, recognizes that a reasonable person could read the City’s English-only policy as creating or contributing to a racially discriminatory hostile work environment. Maj. op. at 1305. Thus, we say, “[t]he very fact that the City would forbid Hispanics from using their preferred language could reasonably be construed as an expression of hostility [by the City] to Hispanics.” Id. at 1305. Whether the City of Altus has created a racially hostile work environment is clearly a matter of public concern.
Nor do the opinions cited by the majority dictate a different outcome. The majority relies on this court’s opinion in Moore v. City of Wynnewood for the proposition that “[a]n employee’s speech must not merely relate generally to a subject matter that is of public interest, but must ‘sufficiently inform the issue as to be helpful to the public in evaluating the conduct of the government.’ ” 57 F.3d 924, 932 (10th Cir.1995) (quoting Wilson v. City of Littleton, Colo., 732 F.2d 765, 768 (10th Cir. 1984)). The record shows that Plaintiffs’ speech was actually the focal point of ongoing local concern. Mr. Sanchez copied his letter complaining of the English-only policy to the mayor and the City attorney. The mayor was quoted as referring to the Spanish language as “garbage.” In other words, the debate itself over the right of City employees to speak Spanish at work was made public and reflected the City’s conflicted attitude toward linguistic and ethnic diversity in general. The City’s prohibition of Spanish in the workplace and Plaintiffs’ resistance to that prohibition more than sufficiently informs the issue of race relations in the City of Altus “as to be helpful to the public in evaluating the conduct of [the City] government.” Id.
The majority’s reliance on language in this court’s opinion in Gardetto v. Mason, 100 F.3d 803, does not dictate a different outcome. We held there that “[i]n deciding how to classify particular speech, courts focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it ha[s] a broader public purpose.” Id. at 812. In making this judgment, we emphasized that “we must evaluate whether Gardetto spoke out based on the same motivation that would move the public to speak out.” Id. Focusing on the motive of Plaintiffs in the present ease, the record shows that their desire to speak Spanish while at work points to a desire to show pride in their heritage and cultural identity in the face of contravening forces and even hostility. It is, as Mr. Sanchez asserts in his letter, an effort to show they are not embarrassed by their ability to speak Spanish and their membership in a minority class. In light of these declared motives, it is hard to see how their speech is calculated merely to redress personal grievances. While Plaintiffs are clearly aggrieved on a deeply personal level, that fact does not militate a conclusion that their speech does not also have a far broader public purpose, that is, to take a stand on a divisive issue in this society.[3]
*1325 Finally, the majority states that, in its estimation, the record indicates “if [the City’s English-only] rule were abolished” Plaintiffs’ speech would consist of the same “sort of thing they had been saying before imposition of the rule, essentially mundane quotidian conversation.” Maj. op. at 1310. That very well may be true. Whether Plaintiffs discussed what they plan to eat for lunch or the upcoming City elections, my analysis of the content of their speech for purposes of the First Amendment would remain the same because the content of ethnic pride in the context of this case does not originate in the words spoken, but in the language used to speak them.
The majority also asserts that, even if Plaintiffs’ choice of language was intended to convey ethic pride, the record does not contain evidence showing that any of the Plaintiffs attempted to communicate this message to the public or to any policymaker. In so doing, the majority recognizes that “[i]f the record contained evidence that Plaintiffs had used or intended to use the Spanish language to emphasize a point or otherwise communicate a message on a matter of public concern, this would be a different case.” Maj. op. at 1312.
I disagree with the majority’s characterization of the record. Mr. Sanchez’s letter to the city administrator asserted that by the very act of speaking Spanish to one another, Hispanic City employees are “expressing [their] heritage.” Aplt.App., vol. II at 521-23. Characterizing the record in the light most favorable to Plaintiffs, as we must on summary judgment, see Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); Otteson v. United States, 622 F.2d 516, 519 (10th Cir.1980), this declaration undercuts the majority’s curious distinction between “taking pride in an act and expressing pride about performing the act.” Maj. op. at 1311 (emphasis in original). In his letter, Mr. Sanchez points out that he and other Hispanics are proud of their heritage and that their use of Spanish is a means of expressing that pride. In other words, the “victory dance in the end zone,” namely, the public expression of pride, is the Plaintiffs’ decision to speak Spanish while on the job, openly, and, perhaps in light of alleged discrimination, even defiantly. If Plaintiffs were merely taking pride in their ability to speak Spanish and their Hispanic heritage, they would be content to speak Spanish solely in their own homes. Their public use of Spanish while at work, on the other hand, conveys more than a private and merely personal pride. Rather, it is the expression of that pride.[4]
*1326 Moreover, the majority is incorrect insofar as it suggests Plaintiffs were required to convey their message to a policymaker or to the public. See maj. op. at 1311. The Supreme Court has held that speech need not be communicated to a policymaker or addressed to the public in general to be classified as speech on a matter of public concern for purposes of the Pickering test. In Rankin v. McPherson, 483 U.S. 378, 386, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Court held that a public employee’s off-hand private remark to a co-worker was protected by the First Amendment because the remark, namely, criticism of presidential policies and a hope that the president might be assassinated, considered in the broader context of national debate, “plainly dealt with a matter of public concern.” The fact that the employee’s private statement was never intended to be public did not affect the Court’s determination that it nonetheless touched on a matter of public concern. Instead, the Court considered the larger context in which the speech took place — an atmosphere of wide-spread news coverage of an assassination attempt and speculation as to the popularity of the president’s policies — in determining its nature for First Amendment purposes. In addition, in Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415-16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Court held that although a teacher complained privately to the school principal about the school district’s efforts to desegregate, her speech nevertheless constituted a matter of public concern. See also Gardetto, 100 F.3d at 815 (“We note that private communications on matters of public interest are entitled to First Amendment protection; an employee need not remonstrate publicly to bring his comments under the aegis of the First Amendment. Private communications are often the most effective way to bring about policy changes and the least disruptive to the delivery of government services.” (internal citations omitted)). Here, Mr. Sanchez complained to the city administrator in a letter that was copied to the mayor. Surely these officials constitute policymakers for defendant City.
Thus, contrary to the majority’s apparent reliance on the absence of evidence in the record showing that Plaintiffs’ use of *1327 Spanish was intended to communicate ethnic pride to the public, the Supreme Court has held that the private-nature of speech is not a determinative factor as to whether the speech touches on a matter of public concern. Rather, inquiries into the public versus private-nature of speech go to the context of the speech, not its content. The content of speech may touch on a matter of public concern even if the speech took place in a private context, as long as the content of the speech (in the present case, ethnic pride) “implicate^] the political or social concerns of the community.” Gardetto, 100 F.3d at 815. Conversely, speech that occurs in public can touch on matters solely of private concern. If, under Rankin, an off-hand (and even offensive) remark made in passing to one’s co-worker can be considered speech touching on a matter of public concern, it is unclear to me why Plaintiffs’ use of Spanish while on the job, every day, in numerous settings and on countless subjects, also does not deserve First Amendment protection as long as it touches on a matter of public concern, namely, ethnic pride and solidarity in a community with a sizeable minority of fellow Hispanics and in a nation currently debating the merits of bilingual workplaces.
In conclusion, it is important to remember what this case is not about. This is not a case involving the sole complaint of one employee in a City with no history of racial tensions. This not a case involving one employee’s complaint against one or two of his supervisors. This is a case involving more than two dozen employees in a diverse workforce in a City with a recent history of racial and national origin discrimination complaints. This is a case in which the City, fully cognizant of that history, nonetheless adopted a broadly-sweeping policy that its director of human resources admitted in her deposition testimony could offend Hispanic employees and further inflame racial tensions. Aplt.App., vol. II at 547-49. This is a case in which we have upheld, for summary judgment purposes, Plaintiffs’ race and national origin discrimination claims against the City for restricting the very speech Plaintiffs want to use. In light of these facts, it seems incorrect to characterize Plaintiffs’ expression of pride in their ethnic identity as reflecting merely “personal” or “internal” grievances. It is also difficult to see how that expression of pride does not add to the public debate on diversity or “sufficiently inform” the public that there are two equally vocal and passionate sides to that debate. Accordingly, I cannot agree with the majority’s statement that Plaintiffs’ proposed speech in Spanish would not be “uttered with an eye to action” or intended to “improve the public welfare.” Maj. op. at 1310. To the contrary, Plaintiffs’ have expressed a desire to speak Spanish in order to sustain their community’s history of linguistic and ethnic diversity and to preserve that history in the everyday details of their lives. The City’s ban on Spanish from the work place creates a public space where Spanish speakers arguably do not feel welcome. In such a. context, it is not hard to imagine the power of a simple “buenos dias” to convey resistance to that effort and hope for the future.
Thus, I respectfully dissent from the majority’s view that such speech in this case does not touch on a matter of public concern. I would remand this issue to the district court for further consideration in light of National Treasury.

. This Circuit as well as our sister circuits have applied the four-part test cited by the majority only to First Amendment retaliation claims. See, e.g., Belcher v. City of McAlester, 324 F.3d 1203, 1205 (10th Cir.2003); Hulen v. Yates, 322 F.3d 1229, 1237 (10th Cir.2003); Clinger v. N.M. Highlands Univ. Bd. of Regents, 215 F.3d 1162, 1165 (10th Cir.2000); Gardetto v. Mason, 100 F.3d 803, 811 (10th Cir. 1996); see also Evans-Marshall v. Bd. of Educ., 428 F.3d 223, 228-29 (6th Cir.2005); Gill v. Pidlypchak, 389 F.3d 379, 380-82 (2d Cir.2004); Cygan v. Wis. Dep’t of Corr., 388 F.3d 1092, 1098 (7th Cir.2004); Metzger v. DaRosa, 367 F.3d 699, 702 (7th Cir.2004); Branton v. City of Dallas, 272 F.3d 730, 739 (5th Cir.2001); McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir.1998); O'Donnell v. Barry, 148 F.3d 1126, 1133 (D.C.Cir.1998); Johnson v. Clifton, 74 F.3d 1087, 1092 (11th Cir. 1996).
The majority states that in Belcher the court declined to apply the National Treasury test. Maj. op. at 1314. In Belcher, however, the plaintiff challenged the reprimand received for engaging in allegedly protected speech. He did not challenge the city's ex ante rule prohibiting city employees from contacting city council members privately. The claim in Belcher, is fundamentally different from Plaintiff's claim in this case. The plaintiff in Belcher challenged an adverse employment action, whereas the Plaintiffs in this case challenge an ex ante prohibition. These are two different claims requiring two different tests.

. The majority states that National Treasury is inapposite because in that case there was no question that the employees' speech constituted a matter of public concern. Maj. op. at 1313-1314. It is true that the Court agreed in National Treasury that the employees' speech involved matters of public concern. But the question of whether speech touches on a matter of public concern is not determinative as to whether the case is properly characterized as an ex ante prior restraint case requiring application of only the two-part test, or as a post hoc retaliation case requiring application of the four-part Pickering-Mt. Healthy test. The four-part test is only applicable if Plaintiffs allege an adverse employment action or a detrimental employment decision. Plaintiffs in National Treasury, like the Plaintiffs in this case, made no such allegations.

. The issue, moreover, appears to grow increasingly divisive every year. Prior to 1981, only two states had laws declaring English their official language, but by 1996, twenty-two states and forty municipalities had enacted English language legislation. Brian L. Porto, Annotation, “English-Only” Requirement for Conduct of Public Affairs, 94 A.L.R. 5th 537, § 2 (2004). As of 2003, twenty-three states had enacted some form of English language legislation, and since 2000, courts in Alaska, Utah, Oklahoma and Iowa have ad *1325 dressed their validity. See Kenya Hart, Defending Against A "Death by English": English-Only, Spanish-Only, and a Gringa’s Suggestions for Community Support of Language Rights, 14 Berkeley La Raza L.J. 177, 178-79, 187 (2003). In an opinion decided in 2002, the Supreme Court of Oklahoma ruled that an initiative petition proposing a statewide English-only statute was constitutionally flawed because the proposed law ran afoul of the state constitution's free speech provisions. In re Initiative Petition No. 366, 46 P.3d 123, 125-28 (Okla.2002). In announcing its decision, the court noted the intensity of the statewide debate sparked by the initiative. Id. at 125. Moreover, powerful public policy groups on both sides of the debate continue to marshal substantial resources to support or defeat English-only legislation at the national, state and municipal levels. See Hart, supra, at 178-79; see also Michael Albert Thomas Pagni, The Constitutionality of English-Only Provisions in the Public Employee Speech Arena: An Examination of Yniguez v. Arizonians for Official English, 24 Hastings Const. L.Q. 247, 248-49 (1996); Margaret Robertson, Abridging the Freedom of Non-English Speech: English-Only Legislation and the Free Speech Rights of Government Employees, 2001 BYU L. Rev. 1641, 1641-42.

. By way of illustrating its argument, the majority presents the example of an immigrant *1326 speaking English to an English-speaking store clerk, stating that the store clerk
one would be surprised to learn that when [the immigrant] conducts a transaction at a department store in English, she is communicating pride in America or even pride in her ability to speak English; [instead] the natural assumption is that the customer simply wants to buy a product and the purpose of carrying on a conversation in English is to accomplish that end.
Maj. op. at 1311. The problem with this illustration is it devalues the speaker's motives, rendering an evaluation of the speech completely dependant on the listener's ability or willingness to interpret it. Even if Plaintiffs’ English-speaking co-workers did not interpret Plaintiffs’ use of Spanish as an expression of their ethnic pride, a court must look to the motive of the speaker, not the reaction of the listener, in determining whether speech was on a matter of public concern. Gardetto, 100 F.3d at 814 ("The controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern, ... because the focus is on the motive of the speaker.” (internal citation and quotation marks omitted)). Just as a co-worker of the plaintiff in Nichol v. Arin Intermediate Unit 28, 268 F.Supp.2d 536 (W.D.Pa.2003), could see Ms. Nichols gold cross necklace as merely a piece of personal adornment, an English-speaking City employee potentially could view Plaintiffs’ use of Spanish as nothing more than a means to accomplish an end — the use of language to convey a request, a question, or a command. The pertinent inquiry here as in Nichol, however, is not whether Plaintiffs actually succeeded in expressing pride in their identity, but whether pride in their identity was the motive for their expression and whether pride in their identity is a matter for public concern.